UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

**Sharon Southwood**, for herself, and all
others similarly situated,

                Plaintiff,

v.

**The Credit Card Solution**, et. al,

                Defendants.

No. 7:09-CV-00081-F

**Chris Taylor**, for himself and all others
similarly situated, et al.,

                Plaintiffs,

v.

**Lee W. Bettis, Jr., Esq.** et al.,

                Defendants.

No. 7:09-CV-00183-F

### Memorandum & Recommendation

This consolidated action[1] presents the question of whether the Plaintiffs are entitled to a

default judgment against a group of Defendants who organized and operated a sham credit repair

program. Although the court has entered a default against the remaining defendants, that is not

the end of the inquiry. The court must determine whether the pleadings contain sufficient factual

allegations to grant a judgment against each Defendant. While Plaintiffs were undoubtedly taken

---

[1] In a March 27, 2014 Order, the court consolidated *Southwood v. The Credit Card Solution*,
7:09-CV-00081-F ("*Southwood*") and *Taylor v. Bettis*, 7:09-CV-000183-F ("*Taylor*").
*Southwood*, D.E. 54.

advantage of and should be made whole, the allegations in their pleadings are not sufficient to provide them with all the relief they seek. Therefore, the undersigned magistrate judge recommends that Plaintiffs' Motion for Default Judgment (*Southwood*, D.E. 60) be granted in part and denied in part.

## I.    Procedural History

### A.    *Southwood* Action

Plaintiff Sharon Southwood filed a verified Complaint in North Carolina Superior Court on January 7, 2009, on behalf of herself and a putative class of similarly situated individuals. The Complaint alleges seven claims for relief: a violation of North Carolina's prohibition on unfair and deceptive trade practices ("UDTPA") (*Southwood* Compl. ¶ 166, D.E. 1-4); fraud (*id.* ¶ 167); gross and willful legal malpractice (*id.* ¶ 168); a violation of the North Carolina Racketeer Influenced and Corrupt Organizations Act ("NC RICO") (*id.* ¶ 169); a violation of the federal Credit Repair Organizations Act ("CROA") (*id.* ¶ 170); a violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (*id.* ¶ 171); and civil conspiracy (*id.* ¶ 172).

Southwood brings these claims against The Credit Card Solution ("TCCS"); CCDN, LLC; R.K. Lock & Associates; Robert K. Lock, Jr.; Colleen Lock; Philip M. Manger; and Robert M. "Bob" Lindsey. She seeks to pierce the corporate veil of the entity defendants in order to hold the individual defendants personally liable for the alleged corporate misdeeds.

After Defendants removed the case to federal court, the parties filed a variety of motions. While many of the motions have no bearing on Southwood's Motion for Default Judgment, the court will briefly address those which do. First, Southwood requested and was granted leave of court to dismiss TCCS and Lindsey without prejudice. D.E. 43, 46. Second, in connection with a

motion to dismiss filed by some of the Defendants, the court determined[2] that Southwood sufficiently alleged a UDTPA claim against CCDN, LLC and R.K. Lock & Associates; a claim of fraud against CCDN, LLC and R.K. Lock & Associates; a CROA claim against CCDN, LLC and R.K. Lock & Associates (Order at 15, 17, 34, *Southwood* D.E. 46), and a RICO claim against Robert Lock and Manger (*id.* at 27). Finally, the court ordered that the Clerk of Court enter a default judgment against Robert Lock; Colleen Lock; Manger; R.K. Lock & Associates; and CCDN, LLC. D.E. 53, 54.

**B.    *Taylor* Action**

The 158 page, 768-paragraph Amended Complaint filed on behalf of Plaintiffs Chris W. Taylor, William G. Harrison, Sr., Linda Sheryl Lucas, Cathy Horton Hunt, Sharon Southwood, and Dorman and Brenda Beasley asserts 13 claims against 32 defendants. The Amended Complaint contains eleven causes of action: unjust enrichment (*Taylor* Am. Compl. ¶ 757, D.E. 23), conversion (*id.* ¶ 758); a violation of NC RICO (*id.* ¶ 759); a violation of the CROA (*id.* ¶ 760); a violation of RICO (*id.* ¶ 761); civil conspiracy (*id.* ¶ 762); tortious interference with a prospective business advantage (*id.* ¶ 764); negligence (*id.* ¶ 765); a violation of North Carolina's UDTPA (*id.* ¶ 766); fraud (*id.* ¶ 767); and gross and willful legal malpractice (*id.* ¶ 768). Additionally, Plaintiffs seek to pierce the corporate veil of the entity defendants in an effort to hold the individual defendants personally liable for corporate misdeeds. *Id.* ¶ 763. Plaintiffs also assert that they are entitled to a constructive trust. *Id.* ¶ 756.

Plaintiffs assert these claims against a number of defendants and divides them into various groups: "Lawyer Defendants," "CCDN Defendants," "R&G Marketing Defendants,"

---

[2] In a number of instances, the district court presumed, but did not decide, that Southwood's allegations were sufficient to withstand the Defendants' Motion to Dismiss. *See* Order, *Southwood*, D.E. 46 at 27 n.10, 34.

"TCCS Defendants," and "Aegis Defendants."

The "Lawyer Defendants" include Lee W. Bettis, Jr., Pat Leigh Pittman, Joanne K. Partin, Robert L. Emanuel, Stephen A. Dunn, Raymond E. Dunn, Jr., Emanuel & Dunn, PLLC, and Bettis Dunn & Dunn;[3] W. Andrew Arnold and The Law Office of W. Andrew Arnold, P.C.;[4] Richard Jude Wasik; and Barrister Legal Services, P.C.

The "CCDN Defendants" include CCDN, LLC; Legal Debt Cure, LLC; R.K. Lock & Associates; Jen Devine; Robert K. Lock, Jr.; Colleen Tomasino Lock; Philip M. Manger; S. John Hagenstein; and Tracy Webster.

The "R&G Marketing Defendants" include Richard D. Russ; Ernest Greg Britt, Jr.; and Excell Marketing, LLC.

The "TCCS Defendants" include The Credit Card Solution; Robert Mitchell "Bob" Lindsey; and Rodney Emil Brisco. Finally, the "Aegis Defendants" include Aegis Corporation; Debt Jurisprudence, Inc.; M. David Kramer; and Marcia M. Murphy.

The Amended Complaint seeks compensatory and treble damages totaling "not less than $1,044,000,000" plus punitive damages. *Taylor* Compl. ¶ 4, D.E. 23. Although not specified in the Complaint, Plaintiffs' motion for default judgment seeks a punitive damages award that would be at least 80 times the compensatory damages awarded by the court. *Southwood* D.E. 60.

As in *Southwood*, the parties filed a variety of motions that impacted both the parties and claims that are remaining in this case. The court dismissed the E&D Defendants (D.E. 117, 120)

---

[3] These Defendants—Bettis; Pittman; Partin; Emanuel; Stephen Dunn; Raymond Dunn, Jr.; Emanuel & Dunn, PLLC; and Bettis Dunn & Dunn—are also known as the "E&D Defendants." E&D Def. Mot. to Dismiss & Ans. at 2, D.E. 45.

[4] These Defendants—Arnold and The Law Office of W. Andrew Arnold, P.C.—are also known as the "Arnold Defendants." Arnold Def. Mot. to Dism. & Ans. at 2, D.E. 52

and the Arnold Defendants (D.E. 117) as a result of various dispositive motions. Additionally, the court dismissed R.K. Lock & Associates; Devine; the Locks; Hagenstein; TCCS; Lindsey; Russ; Britt; R&G Marketing; Excell Marketing, LLC; and Webster because Plaintiffs did not serve them with process within the time required by the federal rules. D.E. 120. The Clerk of Court subsequently entered a default against Aegis; Brisco; Debt Jurisprudence, Inc.; Kramer; Murphy; Barrister Legal Services, P.C.; CCDN, LLC; Legal Debt Cure LLC; Wasik; and Russ.[5] D.E. 72–76, 84–87, 114.

### C. Consolidated Action

As noted above, the court consolidated *Southwood* and *Taylor*. D.E. 54. After Plaintiffs filed their Motion for Default Judgment (*Southwood*, D.E. 60), this court held a hearing on the motion pursuant to Rule 55 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 55(b)(2) (allowing the court to conduct a hearing "when, to enter or effectuate judgment, it needs to: conduct an accounting; determine the amount of damage; establish the truth of any allegation by evidence; or investigate any other matter.").

## II. Factual Background

### A. *Southwood* Action

In late 2007, Southwood was in financial distress. She had seven credit cards with outstanding balances and a company called Unifund CCR Partners sued her in North Carolina

---

[5] Although the Clerk of Court entered default as to Russ (D.E. 114), the court later dismissed him from this action for failure to show service (D.E. 120). The court made counsel aware of Russ's dismissal at the December 18, 2015 hearing as counsel indicated that he did not know that Russ had been dismissed. Hrg. Audio Recording, 11:39:45 to 11:41:35 a.m. (Dec. 18, 2015). If counsel thought that Russ's dismissal was in error, he could have filed a Motion for Relief from an Order pursuant to Rule 60 of the Federal Rules of Civil Procedure, but he did not. His time to file such a motion has expired—the Order dismissing Russ was entered on March 27, 2014 (D.E. 120). *See* Fed. R. Civ. Pro. 60(c)(1) (requiring a Motion for Relief based on error to be made "no more than a year after the entry of the … order").

District Court to recover the debt she allegedly owed. Compl. ¶¶ 102–04, *Southwood* D.E. 1-4. However, she was unable to find an attorney to represent her and began to search online "for a way to deal with this account and others." *Id.* ¶¶ 105–07. Her search led her to a website for TCCS. *Id.* ¶ 107.

TCCS is a Texas-based company that, in exchange for a payment of between $2,500 and $8,000, would promise to restore its customers' credit, eliminate their debt, and obtain damages from debt collectors. *Id.* ¶ 6. The company was owned and operated by Lindsey, who appeared in videos on TCCS's website. *Id.* ¶¶ 6, 57.

TCCS's promises of financial salvation were part of a credit repair and debt elimination program designed by CCDN, LLC. *Id.* ¶¶ 53–54. TCCS was one of several entities that marketed CCDN, LLC's program through videos and other information posted at various locations on the internet. *Id.* ¶¶ 46, 57, 59.

CCDN, LLC is a Nevada-based company, founded in the early 2000s by Robert Lock and Philip Manger. *Id.* ¶ 36, 37. The company is owned by Robert Lock and his wife, Colleen. *Id.* ¶¶ 38, 39. The Locks and Manger appear to be responsible for the company's operations. *Id.* ¶¶ 40, 43. CCDN, LLC works in conjunction with R.K. Lock & Associates, an entity owned and operated by Robert Lock and Manger. *Id.* ¶¶ 8, 10. Both CCDN, LLC and R.K. Lock & Associates do business under various names, including "CCDN," "The CCDN," and "The Credit Collections Defense Network."[6] *Id.* ¶¶ 8–10.

CCDN's credit repair process has several steps. First, CCDN requires that consumers make an advance payment prior to enrolling in its "process." *Id.* ¶ 91. The enrollee must then execute a power of attorney authorizing CCDN to "prepare and sign all documents written with

---

[6] Southwood also alleges the CCDN, LLC does business as "R.K. Lock & Associates."

the intent of researching, challenging, negotiating, and otherwise corresponding with creditors, debt buyers, debt collectors, lw [sic] firms, credit reporting bureaus, and government agencies" with respect to specified accounts. *Id.* ¶ 92. CCDN then sends letters to the enrollees' creditors demanding validation of enrollees' accounts and asking the creditors to execute an affidavit drafted by CCDN that gives certain "assurances" regarding the enrollees' accounts. *Id.* ¶¶ 93–94.

In conjunction with the completion of this paperwork, CCDN instructs enrollees not to repay their debts. *Id.* ¶ 100. CCDN—or those marketing its plan—represent in videos and other testimonials on websites that they then document the various ways debt collectors violate the Fair Debt Collections Practices Act, "build a violations file[,]" and then turn the file over to an attorney who will file a lawsuit against the debt collector. *Id.* ¶ 69. CCDN claims that the debt collector will be motivated to settle the lawsuit, and, that as part of the settlement process, the enrollee's debt will be reduced to zero with no tax consequences, the enrollee's account will be marked as paid with credit reporting agencies, and there will be a financial settlement, which will be split between CCDN and the enrollee. *Id.* However, CCDN knew at the time it made these representations that the legal theories it relied upon were frivolous and that there was no chance that the enrollees would realize any of the benefits promised by its program. *Id.* ¶¶ 35, 95.

Southwood learned of the CCDN program through a video on TCCS's website that featured Lindsey. *Id.* ¶¶ 106–08. After hearing him extol the benefits of the CCDN program, she wanted to sign up. *Id.* ¶ 109. In June 2008, Lindsey emailed her a document entitled "The Credit Card Solution Purchase Agreement." *Id.* ¶ 110. The Agreement stated it was being entered into by Southwood and "Bob Lindsey d/b/a The Credit Card Solution as Authorized Agent for the Credit Collections Defense Network." *Id.* ¶ 111 (parentheses omitted). The Agreement stated: "Member will be provided with a Federally [sic] licensed attorney when the situation warrants at

NO additional attorney fee cost to Member." *Id. ¶* 112. After receiving the Agreement, she paid "Defendants" $5,600 on July 12, 2008.[7] *Id. ¶* 120.

Defendants then provided Southwood with a letter to dispute the Unifund CCR Partners account, which Southwood sent on July 17, 2008, to Universal Bank, N.A., the original creditor on the account. *Id. ¶* 121, 122, 124. Southwood also alleges that Defendants supplied her with "templates and legal advice as to her pending case." *Id. ¶* 125. She contends that "Manger, upon [her] asking, said he would refer her to a lawyer, but that she would have to pay the lawyer's fee herself." *Id. ¶* 126. Manger telephoned Christopher W. Livingston—Southwood's attorney in this action—to see if he would take on her case. *Id. ¶* 128.

Livingston called Southwood and determined that Unifund CCR Partners' lawsuit was time barred and deficient for other various reasons. *Id. ¶* 129. Livingston filed a dispositive motion and, thereafter, Unifund CCR Partners dismissed its case. *Id. ¶¶* 130–31. Although CCDN had promised to pay for Southwood's legal representation, they never paid Livingston for his services. *Id. ¶* 136. Instead, Livingston charged Southwood a flat fee of $1,000. *Id. ¶* 133.

### B. *Taylor* Action

Although broader in scope, the factual allegations in the *Taylor* matter are very similar to the allegations in *Southwood*. The Plaintiffs all allege that they were taken in by a credit repair and debt elimination scam orchestrated by CCDN, LLC and those affiliated with the company. Generally speaking, the program described in *Taylor* is, in all material respects, the same as the program described in *Southwood*. *Compare* Am. Compl. *¶¶* 756–68, *Taylor* D.E. 23 *with* Compl. *¶¶* 166–73, *Southwood* D.E. 55.

---

[7] Given the other dates in the Complaint, the court assumes Southwood paid the $5,600 on July 12, 2008, not 2007.

### 1. The Defendants

CCDN, LLC and Legal Debt Cure, LLC are both limited liability companies organized under Nevada law with their principal addresses in Chicago, Illinois. Am. Compl. ¶¶ 60, 61, *Taylor* D.E. 60. R.K. Lock & Associates is a sole proprietorship with its principal address in Chicago, Illinois. *Id.* ¶ 62. According to Plaintiffs, both CCDN, LLC and R.K. Lock & Associates do business under various names, including "CCDN," "The CCDN," and "The Credit Collections Defense Network." *Id.* ¶¶ 60, 62. Plaintiffs also assert that Legal Debt Cure, LLC is an alter ego of CCDN, LLC. *Id.* ¶ 61.

According to Plaintiffs, the Locks and Manger own CCDN, LLC and Legal Debt Cure, LLC. *Id.* ¶¶ 66–68. CCDN, LLC and R.K. Lock & Associates employed S. John Hagenstein as the Marketing Director or Marketing Manager, Tracy Webster as a paralegal, and Jen Devine as Lead Paralegal. *Id.* ¶¶ 65, 69–70. Devine is also an employee of Legal Debt Cure, LLC. *Id.* ¶ 65.

Plaintiffs also name a number of defendants who sold the CCDN program: The Credit Card Solution ("TCCS"), R&G Marketing, Excell Marketing, LLC, Aegis Corporation ("Aegis"), and Debt Jurisprudence, Inc. ("Debt Jurisprudence"). TCCS is a sole proprietorship owned by Lindsey with its principal address in Houston, Texas. *Id.* ¶¶ 75, 76. R&G Marketing is a general partnership organized under Florida law. *Id.* ¶ 73. Ernest Greg Britt, Jr. and Richard D. Russ are the general partners of R&G Marketing. *Id.* ¶¶ 71–73. Russ is the registered agent of Excell Marketing, LLC, a limited liability company organized under Florida law. *Id.* ¶ 74.

Aegis is a corporation organized under Missouri law. *Id.* ¶ 79. Debt Jurisprudence, another Missouri corporation, was a division of Aegis and is now a subsidiary of Aegis. *Id.* ¶ 80. M. David Kramer is a registered agent and officer of both Aegis and Debt Jurisprudence. *Id.* ¶ 81. Marcia M. Murphy is married to Kramer and is an officer of both Aegis and Debt

Jurisprudence. *Id.* ¶ 82.

Finally, Plaintiffs name a number of attorneys and law firms as defendants. Barrister Legal Services is an Illinois corporation and attorney Richard Jude Wasik is the sole owner and manager. *Id.* ¶¶ 47–48. Wasik provided legal services to Robert Lock. *Id.* ¶ 49. Rodney Emil Brisco provided legal services to Lindsey and TCCS. *Id.* ¶¶ 77–78.

### 2. Taylor's Dealings with Defendants

In 2008, Chris W. Taylor found himself in default on three credit card accounts, with a total debt approaching $35,000. *Id.* ¶¶ 366, 367. After searching on the internet, Taylor found a website promoting TCCS's debt relief program. *Id.* ¶¶ 368, 369. After Taylor reached out to TCCS, Lindsey emailed him a document entitled "The Credit Card Solution Purchase Agreement." *Id.* ¶¶ 373–74.

The Agreement stated that it was between Taylor and "Bob Lindsey d/b/a The Credit Card Solution as Authorized Agent for the Credit Collections Defense Network." *Id.* ¶ 374 (parentheses omitted). According to the Agreement, Taylor was purchasing "the Credit Restoration Debt Invalidation Educational program and services…." *Id.* ¶ 376. The Agreement stated that TCCS would provide Taylor with a "Federally [sic] licensed attorney" when necessary and that there would be no cost to Taylor for the attorney's services. *Id.* ¶¶ 378, 384. Taylor executed the agreement and wired $4,500 to TCCS. *Id.* ¶¶ 368, 387.

Thereafter, Lindsey provided Taylor with the CCDN Enrollment Manual and CCDN provided him with debt dispute letters to send to his creditors. *Id.* ¶¶ 390, 406, 408. However, Taylor contends that his "credit score did not improve, his debt did not shrink or disappear, and Defendants did nothing of any value for him." *Id.* ¶ 414. Taylor then requested a refund from Lindsey, Manger, and Hagenstein. *Id.* ¶¶ 416, 435, 440, 444, 754, 755. Those Defendants either ignored or refused his request. *Id.* ¶¶ 441, 449, 754, 755.

Taylor persistently followed up with CCDN about his disappointment with its product. *Id.* ¶¶ 416, 420, 423, 435, 439, 442, 444, 446, 448, 451. Eventually, a CCDN representative emailed Taylor and informed him American Express had violated federal debt collection law, but that the statute of limitations on Taylor's claim would expire in the coming weeks. *Id.* ¶ 421. The representative also informed Taylor that he should contact his other creditors and inform them that he did not have the money to satisfy his debt in the hopes that the creditors would commit violations of federal law. *Id.*

On the day before the statute of limitations would bar his claims, Taylor emailed Jen Devine; an employee of either R.K. Lock & Associates; CCDN, LLC; or Legal Debt Cure. *Id.* ¶¶ 65, 423. Devine informed Taylor that CCDN was waiting to hear back from an attorney whether he would accept Taylor's case. *Id.* ¶ 424. However, in reality, CCDN had not forwarded Taylor's case to an attorney for review and the limitations period expired without a claim being filed. *Id.* ¶¶ 425, 431, 432, 433.

Although Taylor made several additional attempts to obtain a refund or satisfactory performance from CCDN, he was unable to do so. *Id.* ¶¶ 435–452. Ultimately, the Defendants stopped responding to his inquiries. *Id.* ¶¶ 452.

### 3. Harrison's Dealings with Defendants

William G. Harrison, Sr. found a debt reduction strategy called the "Debt Jurisprudence process" while searching for ways to address his $30,000 in credit card debt. *Id.* ¶¶ 285, 287, 295. The Debt Jurisprudence process was sold, at that time, by the Debt Jurisprudence Division of Aegis.[8] *Id.* ¶ 289. However, the Debt Jurisprudence process was just another name for CCDN's debt relief program. *Id.* ¶289. Aegis, through its executives, Kramer and Murphy,

---

[8] The Debt Jurisprudence division has since been spun off into an Aegis subsidiary called Debt Jurisprudence, Inc. *Id.* ¶ 80.

agreed with R.K. Lock & Associates to market the CCDN program. *Id.* ¶ 291.

Aegis and Debt Jurisprudence claimed on their website that the Debt Jurisprudence process "legally and ethically gets you out of debt and restores your credit by using Federal laws which were created to protect you." *Id.* ¶ 295. The website went on to state that the program was "supported by a nationwide network of licensed attorneys and certified paralegals whose success rate is 100%." *Id.* ¶¶ 291, 295.

After viewing the website and receiving an email from Kramer, Harrison mailed Aegis a $4,200 check in return for the company eliminating his credit card debt. *Id.* ¶¶ 297, 300. Aegis then sent some of the money to CCDN. *Id.* ¶ 303.

CCDN then sent Harrison a series of documents, which included instructions to stop paying his creditors and a method for recording details about his creditors' debt collection efforts. *Id.* ¶ 309, 315. CCDN also sent correspondence to at least four of Harrison's creditors disputing his debts and indicating that he would not make any further payments. *Id.* ¶ 313.

After Harrison stopped making payments, his creditors embarked on various collection efforts. *Id.* 316. Despite CCDN's assurances that debt collectors always commit violations of federal law that would entitle him to monetary damages, his creditors did not do so. *Id.* ¶ 317. CCDN and Webster subsequently instructed Harrison to attempt to arrange a payment plan with at least one of his creditors. *Id.* ¶ 318.

Like the other Plaintiffs, one of Harrison's creditors eventually sued him to recover the outstanding debt. CCDN and Webster provided Harrison with advice on how to respond to pleadings and discovery, drafted legal documents for use in the lawsuit, and other unspecified legal advice. *Id.* ¶ 322. Harrison eventually retained counsel to represent him in the debt collection lawsuit and owes his attorney a fee for his services. *Id.* ¶ 328.

### 4. Lucas's Dealings with Defendants

Linda Sheryl Lucas incurred over $30,000 of credit card debt while caring for a loved one living with Lou Gehrig's disease. *Id.* ¶¶ 253–54. Her attempts to address her financial difficulties led her to a website for an entity called "FDRS."[9] *Id.* ¶ 256. Mark Cella, who had agreed with the Locks and Manger to sell the CCDN program, ran FDRS. *Id.* ¶ 258. The website contended that her unsecured debts were invalid because the banking system was fraudulent and thus it was unlikely that she would be sued if she stopped making payments on her debts. *Id.* ¶¶ 260, 261, 263.

After reviewing the website, Lucas paid "FDRS at least $8,000 to eliminate her debt." *Id.* ¶ 267. FRDS passed an unspecified amount of this money along to CCDN. *Id.* ¶ 268. CCDN then sent various letters to Lucas's creditor in a futile attempt to reduce her debt. *Id.* ¶¶ 267, 272.

One or more of Lucas's creditors sued to recover her outstanding debt. *Id.* ¶ 275. CCDN or FDRS (the Amended Complaint does not specify) advised her about how to respond to the complaint filed against her and prepared various documents that she could file to defend her interests. *Id.* ¶¶ 276–77. Lucas ultimately retained an attorney to represent her and owes her counsel a fee for his or her services. *Id.* ¶ 282.

Subsequently, Lucas demanded that the Defendants refund the amount she paid them. *Id.* ¶ 754. However, to date, they have declined to do so. *Id.*

### 5. Hunt's Dealings with Defendants

Saddled with $80,000 in debt due to fraudulent conduct by her husband, Cathy Horton Hunt was searching for a solution to her financial challenges. *Id.* ¶¶ 216–18. Hunt eventually learned of the CCDN program and got in touch with Manger, who instructed her to contact

---

[9] FDRS was not named as a defendant in the *Taylor* action.

Lindsey. *Id.* ¶¶ 221–23. Lindsey sent Hunt an email that assured her that the CCDN program would allow her to "avoid bankruptcy and arbitration …." *Id.* ¶ 223. After this communication, Hunt had her bank issue a $2,500 cashier's check payable to Lindsey and mailed it to him "in return for CCDN's eliminating her credit card debt as promised." *Id.* ¶ 227. Lindsey then converted an unspecified amount of the fee for his own use and remitted the remainder, if any, to CCDN. *Id.* ¶ 229.

Thereafter, "CCDN provided [Hunt with] a number of papers and directions" (*id.* ¶ 231) that discussed how to record collection attempts made by her creditors. Additionally CCDN "dispatched or caused to be dispatched" various communications to one or more of her creditors. *Id.* ¶ 235. Also, at CCDN's direction, Hunt ceased paying "one or more of her credit cards owed or believed to be owed to a federally insured bank." *Id.* ¶ 236.

Hunt's creditors eventually began efforts to collect on her outstanding debts. *Id.* ¶ 238. Hunt spoke with Tracy Webster, an agent or employee of R.K. Lock & Associates or CCDN, LLC, about how to respond to various legal pleadings and discovery requests served by her creditors. *Id.* ¶ 241. Webster drafted various documents Hunt could file in connection with the lawsuits brought by her creditors. *Id.* ¶ 242.

Ultimately, Hunt paid an attorney $600 to represent her in the lawsuit brought to collect her outstanding debt. *Id.* ¶¶ 247–48. Once her counsel entered a notice of appearance, the plaintiff voluntarily dismissed its suit. *Id.* ¶ 249.

Subsequently, Hunt demanded that the Defendants refund the amount she pa*id. Id.* However, to date, they have declined to do so. *Id.* ¶ 754.

### 6. Southwood's Dealings with Defendants

Sharon Southwood is a plaintiff in both the *Southwood* and the *Taylor* actions. Her alleged dealings with Defendants in *Taylor* are the same as her dealings with Defendants in

*Southwood*, so there is no need for the court to reiterate those facts. The only additional fact included in *Taylor* is that "Defendants" refused her demand for a refund. *Id.* ¶¶ 754, 755.

### 7. The Beasleys' Dealings with Defendants

Dorman and Brenda Beasley began searching for a debt relief solution in late 2007 and found legallyerasedebt.com, "one of Defendants' sites." *Id.* ¶ 453–56. The website claimed that the Beasleys would be able to stop making monthly payments on their debt, restore their credit scores to above 750, invalidate their unsecured debt in no more than 18 months, and "[b]ecome financially free. *Id.* ¶ 456.

The Beasleys called the telephone number provided on the website and spoke to R&G Marketing; a Florida-based general partnership owned by Richard D. Russ and Ernest Greg Britt, Jr. *Id.* ¶¶ 73, 458. Russ, Britt, and their company entered into a contract with Lindsey and TCCS in 2008 to sell the TCCS/CCDN debt relief program. *Id.* ¶ 459. Russ and Britt were aware that the program was fraudulent and could not deliver the results it promised. *Id.* ¶ 466.

During their call with R&G Marketing, the Beasleys "explained that they were encouraged by what they saw [on the website], but would require more assurance before turning over thousands of dollars." *Id.* ¶ 460. They then met with Russ and Britt and were convinced to join the program. *Id.* ¶¶ 462, 468. They paid Russ over $5,000 to join the program and mailed a $2,500 check to Everett Smith (who is not, and never has been, named as a defendant in this action).[10]

The Beasleys then spoke with John Hagenstein, the Marketing Director or Marketing Manager for CCDN; CCDN, LLC; and Legal Debt Cure, who reassured the Beasleys about the

---

[10] Additionally, although the Amended Complaint says that they paid "Defendants" (Am. Compl. ¶ 468, *Taylor* D.E. 23), counsel clarified at the December 18, 2015 hearing that they paid Russ (Audio Tr. Dec. 18, 2015 at 11:41:38 to 11:42:45).

program's efficacy. *Id.* ¶¶ 69, 476.

Thereafter, the Defendants instructed the Beasleys to stop making their credit card payments in the hopes of creditors violating federal debt collection laws. *Id.* ¶¶ 473, 481. However, the Beasleys were unable to eliminate their debt, restore their credit, or obtain monetary damages from their creditors. *Id.* ¶ 479. Instead, their creditors have sued them and they are on the verge of having a judgment entered against them. *Id.* ¶ 483.

## III.     Standard of Review

The question before the court is whether Plaintiffs are entitled to a default judgment against the remaining defendants and, if so, the appropriate award of damages. Prior to entering a default judgment, the court must "determine whether the well-pleaded allegations in [the] complaint support the relief sought. *Ryan v. Homecoming Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001). In making this determination, the court may consider all the well-pleaded factual allegations in the complaint to be admitted. *Id.* However, a defaulted defendant has not admitted conclusions of law, *id.*, or facts that are not well-pleaded, *DIRECTV, Inc. v. Pernites*, 200 F. App'x 257, 2006 WL 2711978, at *1 (4th Cir. 2006) (per curiam).

Once the court determines that default judgment is proper, it must then determine the appropriate amount of damages. *EEOC v. Carter Behavior Health Servs., Inc.*, No. 4:09-CV-00122-F, 2011 WL 5325485, at *4 (E.D.N.C. Oct. 7, 2011). "The court must make an independent determination regarding damages, and cannot accept as true factual allegations of damages." *Id.* In order to make the determination of damages, a court may conduct an evidentiary hearing or rely on affidavits or documentary evidence in the record. *Id.*

## IV.     Sufficiency of Allegations in the *Southwood Action*

The court previously determined the sufficiency of some of the allegations against the

*Southwood* Defendants in an October 23, 2012 Order. *Southwood*, D.E. 46. After that Order, the following claims remain: (1) a UDTPA claim against CCDN, LLC and R.K. Lock & Associates (*id.* at 15); (2) a fraud claim against CCDN, LLC and R.K. Lock & Associates (*id.* at 17); (3) a RICO claim against Robert Lock and Manger (*id.* at 27); and (4) a CROA claim against CCDN, LLC and R.K. Lock & Associates (*id.* at 34). However, in its October 23, 2012 Order, the court presumed, but did not decide, that Southwood sufficiently alleged a pattern of racketeering for her RICO claim and that the individual defendants violated the CROA. *Id.* at 27 n.10, 34. The court also did not determine the sufficiency of her piercing the corporate veil and civil conspiracy claims. *Id.* at 34.

### A.     RICO Claim – Pattern of Racketeering

Section 1962(c) of RICO prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate … commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…." 18 U.S.C. § 1962(c). In order to state a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege facts sufficient to show a defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Whitney, Bradley & Brown, Inc. v. Kammermann*, No. 10-1880, 2011 WL 2489416, at *1 (4th Cir. June 23, 2011).

In its October 23, 2012 Order, the court determined that Southwood alleges three instances of wire fraud that are attributable to Robert Lock and Manger: representations made on TCCS's website (Compl. ¶¶ 107–110); representations set forth in the Purchase Agreement emailed to Southwood (*id.* ¶ 120); and false and misleading legal advice as part of the scheme that "Defendants" transmitted over the interstate wires, presumably via email (*id.* ¶ 138). Order

at 26, D.E. 46. Although the court dismissed TCCS from the suit, the court attributed these instances of wire fraud to Robert Lock and Manger because "the facts alleged, as a whole, allow the plausible inference that both Robert Lock and Manger knew, or should have known, that Lindsey/TCCS, who allegedly was acting as an agent for CCDN, was using the interstate wires to conduct and further the [CCDN] scheme." *Id.* The CCDN scheme, the court found, had the specific intent to defraud because "the allegations allow the reasonable inference that the entire purpose of the CCDN program—founded by Robert Lock and Manger—was to promise relief that in most instances, could not be delivered, in exchange for a fee." *Id.* at 24.

Although the court found that the Complaint alleged three instances of wire fraud, it only presumed that Southwood alleged sufficient facts to establish the "pattern" element of a RICO claim. *Id.* at 27 n.10. ("Given the Defendants' lack of argument on this point [the pattern of racketeering], the court will assume for the purposes of this motion that Southwood's allegations regarding other customers of CCDN's program … will suffice to meet the pattern requirement."). Thus, prior to allowing a default judgment on this claim, the court must determine whether the well-pleaded allegations in the Complaint are sufficient to satisfy this element of a RICO claim.

To demonstrate a pattern of racketeering activity, a plaintiff must allege, at a minimum, that each RICO defendant committed two acts of racketeering activity within a 10-year period. 18 U.S.C. § 1961(5); *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997); *see also GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (expressing reservations about RICO claims where the predicate acts are isolated acts of mail fraud or wire fraud "because it will be the unusual fraud that does not enlist the mails and wires in its services at least twice"). Additionally, the plaintiff must allege "'continuity plus

relationship,' i.e. 'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)) (emphasis in original). The continuity requirement is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Closed-continuity exists when there is "a series of related predicates extending over a substantial period of time." *Id.* at 242. Open-continuity, however, is fact-dependent and is established when the predicates implicitly or explicitly "involve a distinct threat of long-term racketeering activity" or the predicates "are part of an ongoing entity's regular way of doing business." *Id.*

Although Southwood's three allegations of wire fraud all occurred within a two-month period (Compl. ¶¶ 106, 110, 120–122), her allegations are sufficient to establish open-continuity. *See H.J. Inc.*, 492 U.S. at 241 (noting that open-continuity may be established even if there are a small number of related predicates). The facts as alleged "allow the reasonable inference that the *entire purpose* of the CCDN program … was to promise relief that in most instances, could not be delivered, in exchange for a fee." Order at 24, D.E. 46 (emphasis added). Southwood also alleges that CCDN promotes its scheme and solicited business through numerous websites (Compl. at ¶¶ 44, 46, 48), that those promotions reached other consumers (*id.* ¶¶ 144, 145, 151, 152), and that the CCDN scheme has a "widespread reach" (*id.* ¶ 157). It can, therefore, be inferred that committing wire fraud is CCDN's "regular way of doing business" and that there is an implicit threat of long-term racketeering. Furthermore, Southwood sufficiently alleges the wire frauds were all related. *See* Compl. ¶¶ 102–141. Accordingly, the court determines that the facts establish the "pattern" element of a RICO claim and Southwood is entitled to a default

judgment against Robert Lock and Manger as to this claim.

### B. Credit Repair Organization Act Claims

Congress enacted the CROA in part "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679b(b)(2). In its October 23, 2012 Order, the court presumed, but did not decide, that Southwood sufficiently alleged that the individual defendants—Robert Lock, Colleen Lock, and Manger—violated the CROA. *Southwood*, Order at 34, D.E. 46. Therefore, prior to allowing a default judgment on this claim, the court must determine whether the well-pleaded allegations in the complaint are sufficient to establish that these individual defendants violated the CROA.

The district court had previously allowed this claim to proceed because of the potential that the individual defendants could be held liable on a veil-piercing theory. *Id.* at 32 (citing *Zimmerman v. Cambridge Credit Counseling Corp.*, 613 F.3d 60, 73–75 (1st Cir. 2010)). However, given that Plaintiffs have not sufficiently stated a veil-piercing claim, *see infra* Part IV.C, this claim will rise or fall on the allegations contained in the complaint.

#### 1. CROA Claims Against CCDN, LLC & R.K. Lock & Associates

In the October 23, 2012 Order, the district court determined that Southwood stated a claim against CCDN, LLC and R.K. Lock & Associates for violations of §§1679b(a)(3), (a)(4) and (b). Oct. 23, 2012 Order at 32, 34. Therefore, Southwood is entitled to a default judgment against CCDN, LLC and R.K. Lock & Associates on her CROA claims.

#### 2. CROA Claims Against the Individual Defendants Under § 1679b(a)(3)

Section 1679b(a)(3) provides that "[n]o person may … make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. §1679b(a)(3). The Complaint does not contain any factual allegations indicating that the Locks

or Manger made or used any false or misleading statements regarding the services of a credit repair organization. As noted by the district court, Lindsey and TCCS made misleading or untrue statements (Oct. 23, 2012 Order at 33), but there are no similar allegations regarding statements by the individual defendants. The Complaint does allege that Manger "personally and successfully solicited" Southwood, but this vague allegation does not contain sufficient information to allow the court to infer that Manger's statements to Southwood violated § 1679b(a)(3). Therefore, Southwood is not entitled to a default judgment against Robert Lock, Colleen Lock, and Manger on her § 1679b(a)(3) claim.

### 3. CROA Claims Against the Individual Defendants Under § 1679b(a)(4)

Section 1679b(a)(4) provides that "[n]o person may … engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. §1679b(a)(4). The Complaint alleges that the Locks and Manger owned and operated one or more businesses business that existed exclusively for marketing and selling fraudulent credit repair services. Compl. *passim*. These allegations are sufficient to state a claim for a violation §1679b(a)(4) against the individual defendants and, therefore, Southwood is entitled to a default judgment on these claims.

### 4. CROA Claims Under 15 U.S.C. § 1679b(b)

The CROA prohibits a "credit repair organization" from "charg[ing] or receiv[ing] any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." The district court previously recognized that the Complaint did not contain any allegations that the Locks or Manger were personally paid for credit repair services, it was possible that they

21

could be held liable for the conduct of CCDN, LLC and R.K. Lock & Associates under a veil-piercing theory. *Id.* at 32 (citing *Zimmerman v. Cambridge Credit Counseling Corp.*, 613 F.3d 60, 73–75 (1st Cir. 2010)). As discussed below, Southwood failed to allege a viable veil piercing claim. *See infra* Part IV.C. Therefore, she failed to state a claim against the Locks and Manger under § 1679b(b) and, consequently, she is not entitled to a default judgment on this claim against the individual defendants.

C.      **Piercing the Corporate Veil**

Southwood seeks to pierce the corporate veil of CCDN, LLC, in order to collect directly from individual defendants the Locks and Manger. In evaluating this claim, the court will apply the law of the state of Nevada, as it is CCDN, LLC's place of incorporation (*Southwood*, Compl. at ¶ 8, D.E. 1-4). *See Jo v. Piston Mfg., Inc.*, No. 4:06-CV-00056-F, 2009 WL 1578522, at *8 (E.D.N.C. June 2, 2009) (applying the law of the place of incorporation of the Defendant corporation for a piercing the corporate veil claim); *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 349 (M.D.N.C. 1995) ("[I]f the North Carolina Supreme Court were faced with a choice of law question for piercing the corporate veil, it would adopt the internal affairs doctrine and apply the law of the state of incorporation.").

Under Nevada law, there are three requirements for finding that the doctrines of alter ego and piercing the corporate veil apply:

> (1) The corporation must be influenced and governed by the person asserted to be its alter ego[;] (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.

*Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 807, 963 P.2d 488, 496 (1998) (quoting *Ecklund v. Nevada Wholesale Lumber Co.*, 93 Nev. 196, 197, 562 P.2d 479, 479–80 (1977)) (internal quotation

marks omitted) (alteration in original). When determining whether there is a unity of interest, courts look to factors including, but not limited to, "the use of the corporation as a mere shell … for … the business of … another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest, …; [and] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities." *N. Arlington Med. Bldg., Inc. v. Sanchez Const. Co.*, 88 Nev. 515, 522 n.3, 471 P.2d 240, 244 n.3 (1970); *see also Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 602, 747 P.2d 884, 887 (1987) (per curiam). In order to pierce the corporate veil, the findings pointing to a unity of interest must have caused the plaintiff's injury and must have sanctioned a fraud or promoted an injustice. *Polaris*, 103 Nev. at 602, 747 P.2d at 887.

Southwood contends that the Locks and Manger own CCDN, LLC. *Southwood*, Compl. ¶¶ 18, 21, 23, D.E. 1-4. Therefore, the first requirement for finding alter ego and piercing the corporate veil is met. As for the second requirement—unity of interest and ownership— Southwood asserts that Defendants did not observe corporate formalities by "indiscriminately us[ing] the names 'CCDN, LLC,' 'CCDNLLC,' 'R.K. Lock & Associates,' 'The Credit Collections Defense Network,' 'The CCDN,' and other variations, without specifying which entity is doing what." Compl. ¶ 13, D.E. 1-4. This indiscriminate use of names did not cause Southwood's injury. Therefore, Southwood has not alleged sufficient facts to support her veil piercing claim and she cannot obtain a default judgment holding the Locks and Manger liable for CCDN, LLC's tortious conduct.

### D. Civil Conspiracy

Southwood also asserts a civil conspiracy claim in an effort to hold Defendants jointly and severally liable. In North Carolina, "[t]here is no independent cause of action for civil

conspiracy." *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). However, if the plaintiff can establish the existence of a civil conspiracy, all of the conspirators will be jointly and severally liable for the act of any other conspirator undertaken in furtherance of the conspiracy. *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, No. 5:14-CV-519-F, 2015 WL 4723609, at *7 (E.D.N.C. Aug. 10, 2015) (quoting *Jackson v. Blue Dolphin Commc'ns of N. Carolina, L.L.C.*, 226 F.Supp.2d 785, 791 (W.D.N.C.2002))

In order to demonstrate the existence of a civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quoting *Privette v. University of North Carolina*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989)).

First, the court must determine whether two or more individuals agreed to commit the wrongful acts alleged in the Complaint. Although the conspiracy involves four individuals or entities, the Locks and Manger are alleged to be owners and managers of CCDN, LLC, a fellow conspirator. As a general rule, under the intra-corporate immunity doctrine, "[a] corporation's officers, employees, or agents are mere extensions of the corporation, and an agreement between such personnel (or between such personnel and the corporation they serve) is therefore not a conspiracy." *Iglesias v. Wolford*, 539 F. Supp. 2d 831, 835–36 (E.D.N.C. 2008). However, this doctrine does not apply if "the officer has an independent personal stake in achieving the corporation's illegal objectives." *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). This independent personal stake must be something more than a financial stake in the corporation that is involved in the conspiracy. *See Culver v. JBC Legal Grp.*, P.C., No.

5:04-CV-389-FL(1), 2005 WL 5621875, at *7 (E.D.N.C. June 28, 2005). Although the Locks and Manger are all owners or managers of CCDN, LLC, the fact that they are alleged to have conspired with R.K. Lock & Associates, a separate corporate entity, takes Southwood's claims outside of the immunity provided by this doctrine. *See Dunlap v. Cottman Transmissions Sys.*, *LLC*, 576 F. App'x 225, 227 (4th Cir. 2014).

Southwood sufficiently alleges that the Locks, Manger, CCDN, LLC, and R.K. Lock & Associates conspired to commit fraud, violate the CROA, violate the UDTPA, and violate RICO. Although Southwood fails to allege an explicit agreement between Defendants, the allegations in the Complaint allow the court to reasonably infer an agreement and a common scheme. Southwood alleges that Robert Lock and Manger agreed to form "CCDN" (Compl. ¶ 37, D.E. 1-4), that both R.K. Lock & Associates and CCDN, LLC, do business as "CCDN" (*id.* ¶¶ 8, 10), and that the entity defendants "indiscriminately use" the names CCDN, LLC, R.K. Lock & Associates, and The CCDN (*id.* ¶ 13). She further contends that the Locks and Manger own CCDN, LLC (*id.* ¶¶ 18, 21, 23), that Robert Lock owns R.K. Lock & Associates (*id.* ¶ 10), and that Lindsey was acting as an authorized agent for CCDN (*id.* ¶ 111). Finally, Southwood asserts that Defendants run a nationwide, fraudulent credit restoration scheme. *Id.* ¶ 1. Accordingly, the court finds that the allegations of the relationships between the parties and the entity defendants' use of interchangeable names are sufficient to show the existence of an agreement and a common scheme.

Southwood was the victim of fraud and violations of the CROA, the UDTPA, and RICO, and alleges that she was injured by those acts. Her claims arise from the Purchase Agreement that was entered into with Lindsey. Order at 13, 15–17, 26, 29–34, D.E. 46. That Purchase Agreement contained a clause that stated that Lindsey "fully presented and represented the

Product to Member in accordance with all … CCDN policies, procedures, and rules." Compl. ¶ 115. The incorporation of that clause allows the court to infer that CCDN was involved in the creation of the contract, which, as already stated, was the source of Southwood's claims for fraud and violations of the CROA, UDTPA, and RICO (Order at 13, 15–17, 26, 29–34, D.E. 46). Accordingly, the court determines that the Locks; Manger; CCDN, LLC; and R.K. Lock & Associates all conspired to commit fraud and violate the CROA, UDTPA, and RICO. The Locks; Manger; CCDN, LLC; and R.K. Lock & Associates are therefore jointly and severally liable to Southwood for the commission of fraud and the violations of the CROA, UDTPA, and RICO.

## V.     Sufficiency of Allegations in the *Taylor* Action

Plaintiffs in the *Taylor* action assert a number of claims against the remaining defendants.[11] They assert claims for unjust enrichment, conversion, RICO, NC RICO, CROA, civil conspiracy, UDTPA, fraud, and legal malpractice.[12] Plaintiffs also seek to pierce the corporate veil of various entity defendants and impose a constructive trust. The court will address each claim in turn. However, because Plaintiffs allege that CCDN, LLC contracted with other defendants to sell the CCDN program (Am. Compl. ¶ 102, D.E. 23), the court will first determine whether CCDN, LLC can be held vicariously liable for the tortious conduct of both current and dismissed co-defendants.

---

[11] The remaining defendants are CCDN, LLC; Debt Jurisprudence, Inc.; Aegis Corporation; Legal Debt Cure, LLC; Barrister Legal Services, P.C.; Richard Wasik; Philip Manger; Rodney Brisco; M. David Kramer; and Marcia Murphy.

[12] The claims for tortious interference with prospective business advantage and negligence were asserted only against E&D Defendants, who were dismissed from the lawsuit. Pl. Memo. Supp. Mot. for Default Judg. at 5, D.E. 61; Order, D.E. 117; Order, D.E. 120.

## A.  Vicarious Liability

Plaintiffs allege that CCDN, LLC contracted with TCCS, Lindsey, FDRS, Cella, Aegis, and Debt Jurisprudence to sell the CCDN program. *Id.* ¶¶ 60, 103, 116, 259, 291, D.E. 23. The court must, therefore, determine whether CCDN, LLC is vicariously liable for its marketers' actions.

An employer is not vicariously liable for the acts of an independent contractor unless an agency relationship exists between them. *Hylton v. Koontz*, 138 N.C. App. 629, 636, 532 S.E.2d 252, 257 (2000). A principal-agent relationship has two requirements: "(1) [a]uthority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Vaughn v. Dep't of Human Res.*, 37 N.C. App. 86, 91, 245 S.E.2d 892, 895 (1978). Control over the agent occurs when the principal "retains the right 'to control and direct the manner in which the details of the work are to be executed' by his agent." *Vaughn*, 37 N.C. App. at 686, 252 S.E.2d at 795 (quoting *Hayes v. Elon College*, 224 N.C. 11, 15, 29 S.E.2d 137, 139–40 (1944)); *see also Wyatt v. Walt Disney World Co.*, 151 N.C. App. 158, 166, 565 S.E.2d 705, 710 (2002)).

A principal is liable for the torts of his agent in three situations: "(1) when the agent's act is expressly authorized by the principal; (2) when the agent's act is ratified by the principal; or (3) when the agent's act is committed within the scope of his employment and in furtherance of the principal's business." *Creel ex rel. Morgan v. N.C. Dep't of Health & Human Servs.*, 152 N.C. App. 200, 202, 566 S.E.2d 832, 833 (2002). Similarly, a principal may be liable for the torts of his agent through the doctrine of apparent authority. *Green v. Freeman*, 756 S.E.2d 368, 373, 374 (2014). An agent has apparent authority when the principal holds "the agent out as possessing authority or permit[s] the agent to represent that he possess[es] authority." *Phelps-*

*Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 435, 617 S.E.2d 664, 669 (2005). The principal is liable for the agent's acts if the plaintiff "in the exercise of reasonable care, justifiably believed the principal had conferred" apparent authority upon the agent. *Id.* at 435, 617 S.E.2d at 669.

Plaintiffs allege that various "middle men"—TCCS, Lindsey, FDRS, Cella, Aegis, and Debt Jurisprudence—had marketing contracts with CCDN, LLC to sell the CCDN program. Am. Compl. ¶¶ 60, 103, 116, 259, 291, D.E. 23. Only Southwood and Taylor specifically allege that Lindsey and TCCS were "authorized agents" of "CCDN" and that CCDN, LLC does business as CCDN. *Id.* ¶¶ 60, 334, 340, 374, 376. This allows the inference that Lindsey and TCCS were marketing and selling the "Credit Restoration and Debt Invalidation program" on behalf of CCDN, LLC. Accordingly, CCDN, LLC is vicariously liable for the torts TCCS and Lindsey committed in the course of marketing CCDN, LLC's Credit Restoration and Debt Invalidation program to Southwood and Taylor.

Unlike Southwood and Taylor, Hunt, Lucas, Harrison, and the Beasleys do not allege that they received a similar Purchase Agreement. Nor do they allege that CCDN, LLC controlled the manner in which the marketing contractors—TCCS, Lindsey, FDRS, Cella, Aegis, and Debt Jurisprudence—marketed the CCDN program or that those marketing contractors were clothed in apparent authority. Therefore, Plaintiffs cannot establish that CCDN, LLC is vicariously liable for the acts of these marketing contractors.

The Amended Complaint does allege that Lindsey admitted to acting as an agent for CCDN, LLC in a third-party petition in a Texas lawsuit. *Id.* ¶ 676. Judicial admissions are "affirmative statements that a fact exists" and "intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived

conclusion of law." *Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264–65 (4th Cir. 2004). Although judicial admissions are binding in the litigation in which they are made, they are only evidentiary admissions in another case. *See, e.g.*, *Higgins v. Mississippi*, 217 F.3d 951, 954–55 (7th Cir. 2000) (holding that a judicial admission is an evidentiary admission in another lawsuit). Lindsey's admission, however, does not establish vicarious liability in this case because the admission does not establish when Lindsey acted as CCDN, LLC's agent. Therefore, Plaintiffs as a whole have not sufficiently alleged that Lindsey, or any other Defendant for that matter, was acting as an agent within the scope of his authority for CCDN, LLC. Therefore, only Southwood and Taylor sufficiently allege that CCDN, LLC is vicariously liable for the actions of Lindsey and TCCS.

### B.     Claim Preclusion

Southwood is precluded from asserting a number of the claims in *Taylor* due to the doctrine of *res judicata*. In order to determine the preclusive effect of a prior federal judgment, courts apply federal law. *Shoup v. Bell & Howell Co.*, 872 F.2d 1178, 1179 (4th Cir. 1989). Under federal law, a party is barred from asserting a claim if: "1) the parties [are] the same or in privity with the original parties; 2) the claims in the subsequent litigation [are] substantially the same as those in the prior litigation; and 3) the earlier litigation … resulted in a final judgment on the merits." *Id.* A dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is a final judgment on the merits if it is not for lack of jurisdiction, improper venue, or failure to join a party. *McMillan v. Metro. Life Ins. Co.*, No. 7:14-CV-00039-F, 2014 WL 7205227, at *3 (E.D.N.C., Dec. 17, 2014). Furthermore, the "[r]ules of claim preclusion provide that if the later litigation arises from the same cause of action as the first, then the judgment bars litigation not only of every matter actually adjudicated in the earlier case, but also of every claim that might have been presented." *In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996).

In her earlier action, Southwood asserted violations of RICO, NC RICO, CROA, UDTPA; along with common law claims of fraud and legal malpractice against CCDN, LLC, R.K. Lock & Associates, the Locks, and Manger. Defendants filed a Motion to Dismiss (D.E. 9), and the court found Southwood: (1) "pleaded sufficient facts to state a claim against Defendants Robert Lock and Manger under § 1962(c)" (Order at 27, *Southwood* D.E. 46); (2) failed to sufficiently allege a NC RICO claim (*id.* at 28–29); (3) sufficiently alleged that CCDN, LLC and R.K. Lock & Associates violated the CROA (*id.* at 34); (4) sufficiently alleged that CCDN, LLC was vicariously liable for the UDTPA violations committed by TTCS and Lindsey (*id.* at 14); (5) "alleged sufficient facts to state a claim of fraud against CCDN, LLC (*id.* at 17); and (6) failed to state a claim for legal malpractice (*id.* at 19). These holdings are final judgments on the merits of Southwood's claims. *See McMillan*, 2014 WL 7205227, at *3. Although Southwood did not assert a claim for a violation of § 1962(d) in *Southwood*, she could have brought such a claim.

In *Taylor*, Southwood asserts numerous Defendants, including Manger and CCDN, LLC, violated RICO, NC RICO, CROA, and the UDTPA; and committed fraud and legal malpractice. Am. Compl. ¶¶ 759–61, 766–68, D.E. 23. Southwood's claims arise from her interactions with Lindsey and CCDN, LLC. *Id.* ¶¶ 329–65. Therefore, because the parties in each action are the same or in privity with the original parties, the claims in each are substantially the same, and, if these recommendations are adequate, there will be a final judgment on the merits in the earlier case, Southwood should be barred from asserting these claims in the *Taylor* action.

C.     **Unjust Enrichment**

Plaintiffs' first assert a claim for unjust enrichment against all remaining defendants. Unjust enrichment is "a claim in quasi contract or a contract implied in law" and courts will not apply unjust enrichment when "there is a contract between the parties." *Booe v. Shadrick*, 322

N.C. 567, 570, 369 S.E.2d 554, 556 (1988). A prima facie claim for unjust enrichment has five elements. First, the plaintiff must have conferred a direct, measurable benefit to the other party. *Butler v. Butler*, 768 S.E.2d 332, 336 (N.C. Ct. App. 2015) (stating the need for a measurable benefit); *Effler v. Pyles*, 94 N.C. App. 349, 353, 380 S.E.2d 149, 152 (1989) (stating directness requirement); *Baker Constr. Co. v. City of Burlington*, No. COA09-13, 2009 WL 3350747, at *6 (N.C. Ct. App. Oct. 20, 2009) (unpublished), *review denied*, 363 N.C. 800 (2010) (reiterating the requirement for a direct benefit). "Second, the benefit must not have been conferred officiously," *Butler*, 768 S.E.2d at 336, or as the result of the other party's solicitation or inducement, *Wright v. Wright*, 305 N.C. 345, 350, 289 S.E.2d 347, 351 (1982). Finally, the benefit cannot be gratuitous and must have been "consciously accepted" by the defendant. *Butler*, 768 S.E.2d at 336. After reviewing the Amended Complaint, the court determines that (1) Hunt, Lucas, Southwood, Taylor, and the Beasleys fail to state a claim for unjust enrichment and (2) Harrison sufficiently alleges that Aegis was unjustly enriched.

> **1. Hunt, Lucas, Southwood, Taylor, and the Beasleys Fail to State a Claim for Unjust Enrichment**

Hunt, Lucas, Southwood, Taylor, and the Beasleys all fail to state a claim for unjust enrichment because they conferred a benefit upon a dismissed or unnamed defendant: Hunt and Southwood paid dismissed defendant Lindsey (Am. Compl. ¶¶ 227, 344, D.E. 23); Lucas asserts that she paid FDRS, an entity that was not named as a defendant (*id.* ¶ 267); Taylor paid TCCS, another dismissed defendant (*id.* at 387); and the Beasleys paid dismissed defendant Russ.[13] Although Southwood and Taylor sufficiently allege that CCDN, LLC is vicariously liable for the

---

[13] Although the Amended Complaint states that the Beasleys paid "defendants" (Am. Compl. ¶ 468, D.E. 23), counsel clarified at the December 18, 2015 hearing that they paid Russ (Audio Tr. Dec. 18, 2015 at 11:41:38 to 11:42:45).

acts of Lindsey and TCCS, unjust enrichment requires them to have directly conferred the benefit upon the defendant (CCDN, LLC). *See Effler*, 94 N.C. App. at 380, S.E.2d at 152. Thus, only Harrison has a potential claim for unjust enrichment against Aegis. *Id.* ¶¶ 300, 468.

### 2. Harrison States a Claim for Unjust Enrichment against Aegis

Harrison sufficiently states a claim for unjust enrichment against Aegis. He alleges that he paid Aegis $4,200 for its debt elimination services and that Aegis deposited his payment. *Id.* ¶¶ 300, 303. He further alleges that the Aegis website, which he read and relied upon, asserts that the Debt Jurisprudence process has a 100% success rate of restoring credit and removing debt. *Id.* ¶¶ 295, 300.[14] Therefore, Harrison conferred onto Aegis a direct, measurable benefit, which was the result of Aegis's solicitation, and Aegis consciously accepted that benefit. Accordingly, the court determines that Harrison is entitled to a default judgment because he sufficiently alleged a claim of unjust enrichment against Aegis.

### D. Conversion

Plaintiffs next assert a claim for conversion. In North Carolina, there are two essential elements for conversion. First, the plaintiff must have owned the property in question. *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. 525, 532, 551 S.E.2d 546, 552, *review denied*, 353 N.C. 363 (2001). The property in question can include money "only when it is capable of being identified and described." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 528, 723 S.E.2d 744, 750 (2012) (internal quotation marks and emphasis removed) (quoting *Alderman v. Inmar Enters., Inc.*, 201 F. Supp. 2d 532, 548 (M.D.N.C. 2002), *aff'd per curiam*, 58 F. App'x 47 (4th Cir. 2003)). Money is identified and described when a specific sum

---

[14] Harrison does not allege that he had an explicit contract with Aegis, nor does he allege the existence of a Purchase Agreement.

is alleged as the converted property. *Id.* at 529, 723 S.E.2d at 750–51. Similarly, electronically transferred funds "may be sufficiently identified through evidence of the specific source, specific amount, and specific destination of the funds in question." *Id.* Secondly, the defendant must have wrongfully converted the property. *Lake Mary Ltd. P'ship*, 145 N.C. at 532, 551 S.E.2d at 552. A conversion occurs when the defendant initially had rightful possession of the property, the plaintiff demands the property back, and the defendant makes an "absolute, unqualified refusal to surrender" the property causing the plaintiff to bring a lawsuit to recover his property. *Hoch v. Young*, 63 N.C. App. 480, 483, 305 S.E.2d 201, 203, *review denied*, 309 N.C. 632 (1983) (quoting Prosser, *The Law of Torts* 4th, § 15, at 89–90 (1971)). A claim of conversion may be asserted against a third-party that comes into possession of the property in question. *See Variety Wholesalers*, 365 N.C. at 521, 723 S.E.2d at 745. After reviewing the Amended Complaint, the court determines that (1) Lucas, Hunt, and the Beasleys fail to state a claim for conversion; (2) Southwood and Taylor sufficiently allege a claim for conversion against CCDN, LLC; and (3) Harrison sufficiently alleges a claim for conversion against Aegis.

### 1. Lucas, Hunt, and the Beasleys Fail to State a Claim for Conversion

Lucas, Hunt, and the Beasleys all fail to state a claim for conversion. Although Lucas allegedly paid FDRS, Hunt allegedly paid Lindsey, and the Beasleys allegedly paid Russ (Am. Compl. ¶¶ 227, 267, 468, D.E. 23; Audio Tr. Dec. 18, 2015 at 11:41:38 to 11:42:45), those Defendants were either dismissed or not named as defendants in this dispute. Additionally, as already discussed, those Defendants were not agents of any of the remaining defendants. *See supra* Part V.A.

Lucas, Hunt, and the Beasleys also allege that the other Defendants—CCDN, LLC; Brisco; Wasik; Barrister Legal Services; Legal Debt Cure; Debt Jurisprudence; Murphy; and

Kramer—came into possession of the funds they paid to either FDRS, Lindsey, or Russ. However, they fail to allege the specific amount received from FDRS, Lindsey, or Russ and therefore, fail to sufficiently allege a claim for conversion against these Defendants. *See Variety Wholesalers*, 365 N.C. at 529, 723 S.E.2d at 750–51 (requiring identification of converted property when the converted property is alleged to be money or electronically transferred funds). Accordingly, Lucas, Hunt, and the Beasleys fail to state a claim for conversion.

### 2. Southwood, Taylor, and Harrison Sufficiently Allege Claims for Conversion

Southwood, Taylor, and Harrison do state a claim for conversion. Southwood and Taylor allege that they paid Lindsey and TCCS, respectively, for CCDN, LLC's "Credit Restoration and Debt Invalidation program." Am. Compl. ¶¶ 60, 340, 344, 383, 387, D.E. 23. Southwood and Taylor then allege that Defendants absolutely refused their request for a refund, which they made after realizing that the program was not beneficial to them. *Id.* ¶¶ 355, 356, 416, 435, 442, 444, 754, 755. As discussed above, Southwood and Taylor also allege facts which allow the inference that Lindsey and TCCS were acting as agents of CCDN, LLC. Accordingly, Southwood and Taylor allege sufficient facts to state a claim of conversion against CCDN, LLC.

Southwood, Taylor, and Harrison also allege that other Defendants—Brisco; Wasik; Barrister Legal Services; Legal Debt Cure; Debt Jurisprudence; Murphy; and Kramer—came into possession of funds paid to either Lindsey; TCCS; or Aegis. However, they fail to allege the specific amount received from Lindsey; TCCS; or Aegis. *Id.* ¶¶ 47, 50, 61, 68, 79, 82, 301, 721. Therefore, they do not sufficiently state a claim for conversion against these Defendants. *See Variety Wholesalers*, 365 N.C. at 529, 723 S.E.2d at 750–51 (requiring identification of converted property when the converted property is alleged to be money or electronically transferred funds).

Harrison alleges that he paid Aegis for access to its debt elimination service. *Id.* ¶ 300. The Amended Complaint then alleges that Harrison demanded his money back after realizing that he was not receiving a benefit from the program. *Id.* ¶¶ 327, 754, 755. However, Aegis absolutely refused to tender the refund. *Id.* ¶ 755. Therefore, Harrison sufficiently alleges a claim of conversion against Aegis.

### E. RICO

Plaintiffs next allege that "Individual Defendants"—Manger, Kramer, Murphy, Wasik, and Brisco—violated § 1962(c) and (d). They seek treble damages and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), which provides a civil remedy to "any person injured in his business or property by reason of a violation of [18 U.S.C. §] 1962." Section 1962(d) imposes liability for conspiring to violate other parts of section 1962. 18 U.S.C. § 1962(d). After reviewing the Amended Complaint, the court determines that Hunt, Taylor, and Harrison sufficiently allege that Manger violated § 1962(c).

### 1. Section 1962(c) Claim

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). It is "aimed at the use of an enterprise to carry out racketeering activities." *Benard v. Hoff*, 727 F. Supp. 211, 213 (D. Md. 1989). To state a claim under § 1962(c), a plaintiff must allege facts sufficient to show that a defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Whitney, Bradley & Brown, Inc. v. Kammermann*, No. 10-1880, 2011 WL 2489416, at *1 (4th Cir. June

23, 2011). Additionally, a plaintiff must allege that she suffered damage to "business or property" proximately caused by the defendant's RICO violation. *Sedima*, 473 U.S. at 496.

a)      **Enterprise**

A RICO enterprise includes "any individual, partnership, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "There is no restriction upon the associations embraced by" the definition of a RICO enterprise—a RICO enterprise includes legitimate and illegitimate enterprises, *United States v. Turkette*, 452 U.S. 576, 580 (1981), as well as associations-in-fact, *Boyle v. United States*, 556 U.S. 938, 948 (2009). An association-in-fact enterprise is "'a group of persons associated together for a common purpose of engaging in a course of conduct'" that "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 948 (quoting *Turkette*, 452 U.S. at 583).

Plaintiffs clarify that the individual defendants conducted the association-in-fact "CCDN Enterprise," which is comprised of the remaining defendants Wasik; Barrister Legal Services; Legal Debt Cure; CCDN, LLC; Manger; Brisco; Aegis; Debt Jurisprudence; Kramer; and Murphy. Pls. RICO Case Stmt. at 14–15, *Southwood* D.E. 68. Plaintiffs also allege that Wasik is the sole proprietor of Barrister Legal Services. Am. Compl. ¶¶ 47–48, D.E. 23.

Plaintiffs sufficiently allege that the CCDN Enterprise had a common purpose and a sufficient longevity allowing the associates to pursue that purpose. The allegations contained in the Amended Complaint, taken as a whole, establish that the CCDN Enterprise had the common purpose of selling fraudulent debt relief and credit restoration services to consumers. Am. Compl. ¶¶ 90–102, 105–09, 135–213, D.E. 23. The Amended Complaint also clearly alleges that the enterprise has "no end in sight." *Id.* ¶ 215.

36

The allegations regarding the relationships between the various entities—CCDN, LLC; Legal Debt Cure; Aegis; Debt Jurisprudence; and Barrister Legal Services—and the individuals in the CCDN Enterprise are not as explicit. Plaintiffs allege that CCDN, LLC does business as "CCDN" (*id.* ¶ 60) and that "CCDN has at various times taken at least the following names and forms … CCDN, LLC; ... [and] Legal Debt Cure…." (*id.* ¶ 85). Plaintiffs also allege that a website included Legal Debt Cure and CCDN in the title of a web page. *Id.* ¶¶ 151, 154, 159, 161. Plaintiffs further allege that Manger is the owner of CCDN, LLC and Legal Debt Cure. *Id.* ¶¶ 61, 68.

With regards to Aegis and Debt Jurisprudence, Plaintiffs allege that Debt Jurisprudence was a division of Aegis at the time of the events contained in the Amended Complaint (*id.* ¶ 80) and that "Aegis/Debt Jurisprudence" sold the CCDN program as the "Debt Jurisprudence process" (*id.* ¶ 291). Plaintiffs also allege that Kramer and Murphy were both officers of Aegis and that they also sold the CCDN program. *Id.* ¶¶ 81, 82, 291.

Plaintiffs' sole allegations regarding Barrister Legal Services arise from Barrister Legal Services' involvement in defending Manger and other dismissed Defendants in unrelated actions. *Id.* ¶¶ 48–52. Similarly, Plaintiffs' sole allegation regarding Wasik is that he owns Barrister Legal Services and he provided legal services to Robert Lock, Manger, Webster, and R.K. Lock & Associates. *Id.* ¶¶ 47, 49. Finally, with regards to Brisco, Plaintiffs allege that he defended Lindsey and TCCS in an unrelated lawsuit and provided services to the "Freedom From Debt Alliance"—an entity that Plaintiffs did not interact with and was not named in this suit. *Id.* ¶¶ 78, 690. Therefore, Barrister Legal Services, Brisco, and Wasik did not share the common purpose of selling debt relief and credit restoration to consumers. Accordingly, the court determines that

the "CCDN enterprise" consists of Legal Debt Cure; CCDN, LLC; Aegis; Debt Jurisprudence; Manger; Kramer; and Murphy.

### b)    Person/Enterprise Distinction

Two elements fundamental to any RICO claim are "person" and "enterprise." The RICO statute defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." In the context of a § 1962(c) RICO claim, a "person" is the individual or entity "employed by or associated with" the "enterprise." § 1962(c). Accordingly, in § 1962(c) actions, the "enterprise" must be distinct from the "person" alleged to have violated the statute. *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997) ("The enterprise must be distinct from the persons alleged to have violated § 1962(c)."); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840 (4th Cir. 1990). This distinctiveness requirement is met when the person alleged to violate § 1962(c) is the corporate owner or employee of a corporation enterprise. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001) ("The corporate owner/employee, a natural person, is distinct from the corporation itself…."). Additionally, a RICO claim may be sustained under § 1962(c) when the defendant is a RICO person and a member of the association-in-fact enterprise. *AARP v. Am. Family Prepaid Legal Corp., Inc.*, 604 F. Supp. 2d 785, 791–92 (M.D.N.C. 2009).

In this case, Plaintiffs allege that "Individual Defendants unlawfully conducted the affairs of the RICO Enterprises…." Am. Compl. ¶ 761, D.E. 23. Because the court dismissed the claims against Devine; Robert Lock; Colleen Lock; Hagenstein; Lindsey; Russ; Britt; and Webster (D.E. 120), the remaining "Individual Defendants"—Wasik, Manger, Brisco, Kramer, and Murphy—are alleged to be the persons who conducted a RICO enterprise and are the defendants at issue in this claim. Although Manger, Kramer, and Murphy are also part of the CCDN Enterprise, "RICO claims have been sustained under section 1962(c) where there is only partial

38

overlap between the person and the enterprise, and where the defendant may be a RICO person yet one of a number of members of the alleged enterprise." *AARP*, 604 F. Supp. 2d at 791–92 (citations omitted). Accordingly, the court finds that Plaintiffs may still sustain their § 1962(c) claim against the remaining individual Defendants.

**c)** **Conduct or Manage the Affairs of the Enterprise**

In order to state a § 1962(c) claim, Plaintiffs must first show that Defendants conducted or participated in the CCDN enterprise. *See* 18 U.S.C. § 1962(c); *Sedima, S.P.R.I.*, 473 U.S. at 496. In *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), the Supreme Court held that "'to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." An enterprise may be operated by upper management, "by lower rung participants in the enterprise who are under the direction of upper management, and by "outsiders" who exert control over the enterprise. *Id.* at 184. In order to hold "complete outsiders" liable under § 1962(c), a plaintiff must show "that the defendants conducted or participated in the conduct of the '*enterprise's* affairs' not just their *own* affairs" or that they "are associated with' an enterprise and participate in the conduct of *its* affairs—that is, participate in the operation or management of the enterprise itself." *Id.* at 184–85 (emphasis in original). The Supreme Court then affirmed the granting of summary judgment on a § 1962(c) claim against an outside accounting firm, even though the evidence suggested that the accounting firm had created the very financial statements it was hired to audit for its client and took on the responsibility of deciding how to value its client's most valuable asset. *Id.* at 186; *see also id.* at 189–90 (Souter J., dissenting).

Since the *Reves* decision, most courts have held that an outside professional, such as an attorney, "does not conduct an enterprise's affairs through run-of-the-mill provision of professional services." *Handeen v. Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997) (collecting

39

cases); *see also Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 554 (D. Md. 1998) ("Since *Reves*, a number of Courts have dismissed complaints and granted summary judgment in favor of professionals, such as lawyers and accountants, whose professional services were essential to an enterprise yet did not participate in the direction, operation, or management of the enterprise."). These same courts have recognized, however, that *Reves* did not establish blanket immunity from RICO liability on outside professionals. *See, e.g.*, *Handeen*, 112 F.3d at 1349 ("Neither *Reves* nor RICO itself exempts professionals, as a class, from the law's proscriptions...."). Rather, these courts have recognized that an outside professional, such as an attorney, may be liable under § 1962(c) if he renders professional services that "strike at the very core of the enterprise." *Thomas*, 9 F. Supp. 2d at 554; *see also Handeen*, 112 F.3d at 1349 ("Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and we will not shrink from finding an attorney liable when he crosses the line from traditional rendition of legal services and active participation in directing the enterprise."); *State Farm Mut. Automobile Ins. Co. v. Abrams*, No. 96 C 6365, 2000 WL 574466, at *11 (N.D. Ill. May 11, 2000) ("If a doctor or lawyer provides services that go to the heart of the allegedly fraudulent scheme, the professional may be liable for providing some direction in the affairs of the enterprise.").

For example, in *Handeen*, the Eighth Circuit Court of Appeals reversed the district court's granting of summary judgment to a defendant law firm and its principals on the plaintiff's RICO claims because the allegations, if proven, would allow the finding that the attorneys and law firm participated in the core activities that constituted the affairs of the enterprise. 112 F.3d at 1350. Specifically, the plaintiff in *Handeen* was a creditor in a Chapter 13 bankruptcy proceedings who alleged that the debtor-in-bankruptcy sought to use the bankruptcy

system to fraudulently obtain a discharge of the creditor's judgment. The plaintiff alleged the law firm hired by the debtor instructed the debtor to overstate his debts (and execute a false promissory note) and devised a scheme to conceal the debtor's increased income. The Eighth Circuit concluded that the allegations were sufficient to show that the law firm took the lead in making important decisions concerning the operation of the "enterprise"—which in *Handeen* was the Chapter 13 bankruptcy estate. Similarly, courts have held that attorneys can be held liable under RICO where they acted as direct participants in the alleged scheme to file false claims or lawsuits. *See, e.g.*, *Abrams*, 2000 WL 674466, at *11 (denying attorney defendants' motion for summary judgment where the alleged purpose of the enterprise was to manufacture and pursue fraudulent insurance claims and the evidence suggested the attorneys knowing pursued false claims); *Shuttlesworth v. Housing Opportunities Made Equal*, 873 F. Supp. 1069, 1075 (S.D. Ohio 1994) (denying attorney defendants' motions to dismiss where attorneys allegedly actively solicited false sexual harassment complaints against plaintiff landlord in an effort to deprive him of his rental properties).

Here, Plaintiffs allege that Wasik, Brisco, Manger, Murphy, and Kramer participated in or conducted the alleged CCDN enterprise. Wasik is an attorney who defended Manger and dismissed defendants Robert Lock and Webster in other actions. Am. Compl. ¶¶ 47, 49–51, D.E. 23. Similarly, Brisco, another attorney, defended dismissed defendants TCCS and Lindsey in previous actions unrelated to the instant case. *Id.* ¶ 78. Whatever Plaintiffs' objections may be as to how Wasik and Brisco rendered legal services in defense of their clients, it cannot be said that the actions of Wasik and Brisco went to the heart of CCDN's alleged debt elimination and credit restoration scheme. Rather, defending other actions, without involvement in the alleged debt elimination and credit restoration scheme, quintessentially is the "traditional rendition of legal

services." *Handeen*, 112 F.3d at 1349. Accordingly, under these facts, accepting money in exchange for providing traditional legal services fails to go to the heart of CCDN's alleged debt elimination and credit restoration scheme.

Manger, Murphy, and Kramer did, however, participate in or conduct the CCDN enterprise. Plaintiffs allege that Manger is a co-founder, owner, and manager of CCDN, LLC, encouraged Hunt to join CCDN, and communicated with Southwood and Taylor regarding a lawyer referral and a refund request, respectively. Am. Compl. ¶¶ 60, 68, 84, 222, 355, 439, D.E. 23. Furthermore, Harrison alleges that Kramer and Murphy sold the CCDN debt relief and credit restoration program. *Id.* ¶ 291. Accordingly, Plaintiffs sufficiently allege that Manger conducted or participated in the CCDN enterprise and Harrison sufficiently alleges that Kramer and Murphy conducted or participate in the CCDN enterprise.

### d) Predicate Acts of Racketeering Activity

Under RICO, "racketeering," or a "predicate act," is broadly defined to include the commission of several federal statutory and state common law offenses. *See* 18 U.S.C. § 1961(1). Included in this definition are the offenses referenced in the Amended Complaint: bank fraud, mail fraud, wire fraud, and money laundering. *See* § 1961(1)(B); Am. Compl. ¶ 761, D.E. 23.

### (1) Bank Fraud (18 U.S.C. § 1344)

Section 1344 prohibits any person from executing or attempting to execute a scheme or artifice (1) to defraud a financial institution or (2) to obtain any of the assets owned by or controlled by a financial institution by fraudulent means. 18 U.S.C. § 1344. In a previous Order, this court held that only financial institutions have standing to assert bank fraud. *Southwood Order*, D.E. 46 at 22 ("The court finds the reasoning of those courts holding that only financial

institutions have standing to assert Bank Fraud persuasive and adopts it herein."). Accordingly, because Plaintiffs are not financial institutions, they may not rely on bank fraud as a predicate act to support their RICO claim.[15]

### (2)     Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343)

Plaintiffs allege that Manger, Murphy, and Kramer committed mail and wire fraud. The federal mail and wire fraud statutes prohibit similar behavior and, therefore, share similar elements. *American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233 (4th Cir. 2004) ("The federal mail and wire fraud statutes prohibit the use of the mails or interstate wires in furtherance of schemes to defraud.") (citing 18 U.S.C. §§ 1341, 1343). In a prosecution for mail fraud, the Government must prove (1) a scheme disclosing an intent to defraud; and (2) the use, or causing the use, respectively, of the mails or interstate wires in furtherance of the scheme. *ld.* (applying elements to a civil RICO claim). In order to establish a scheme to defraud, the Government must prove that a defendant acted with the specific intent to defraud, which "may be inferred from the totality of the circumstances and need not be proven by direct evidence." *United States v. Ham*, 998 F.2d 1247, 1254 (4th Cir. 1993). Assuming that a complaint adequately sets forth a scheme to defraud in connection with mail or wire fraud allegations, "each mailing or wire transmission in furtherance of the fraud scheme constitutes a separate offense." *United States v. Jefferson*, 674 F.3d 332,367 (4th Cir. 2012). Additionally, it is not necessary to allege or show that a defendant personally placed a matter in the mails or placed the wire transmission which supplies the basis for liability under the mail and wire fraud statutes.

---

[15] Alternatively, even if Plaintiffs do have standing to allege financial institution fraud as a predicate claim, they have not alleged sufficient facts to show that any of the individual defendants had the specific intent to defraud a financial institution (as opposed to the individual customers of CCDN) or that the individual defendants were attempting to obtain assets controlled by a financial institution by fraudulent means. 18 U.S.C. § 1344.

43

Rather, it is only necessary that a defendant is a participant in a scheme to defraud and knew or reasonably should have known of the use of the mails or wires in connection with the scheme. *United States v. Perkal*, 530 F.2d 604, 606–07 (4th Cir. 1976) (rejecting a defendant's argument that he could not have violated the mail fraud statute because he did not personally place items in the mail, and explaining that "'it is enough if he knows that in the execution of the scheme that letters are likely to be mailed, and if in fact they are mailed'") (quoting *United States v. Cohen*, 145 F.2d 82, 90 (2d Cir. 1944)); *see also Pereira v. United States*, 347 U.S. 1, 8–9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used.").

The allegations contained in the Amended Complaint, taken as a whole, show that there was a general scheme to sell fraudulent debt relief to consumers. That general scheme is comprised of four smaller schemes to defraud: one affecting Hunt and Taylor, one affecting Lucas, one affecting the Beasleys, and one affecting Harrison.

### (a) Hunt and Taylor Sufficiently Allege that Manger Committed Wire Fraud

Hunt and Taylor allege sufficient circumstantial facts to find that Lindsey concocted a scheme to defraud them, including that (1) Lindsey created multiple deceptive videos (Am. Compl. ¶¶ 123, 125, 127, 129, 131, 133, D.E. 23); (2) Lindsey made over forty videos promoting the CCDN program pursuant to a contract with R.K. Lock & Associates—a dismissed defendant who did business as "CCDN" (*id. ¶* 62, 116, 118); and (3) Lindsey benefited each time a new consumer signed up for the CCDN program (*id. ¶* 116–17). *See United States v. Harvey*, 532 F.3d 326, 334 (4th Cir. 2008) (finding that there was sufficient circumstantial evidence of a scheme to defraud when there was (1) evidence the defendant made misrepresentations regarding

a corporation's capabilities, (2) evidence that the defendant had ongoing involvement with that corporation's contract, and (3) evidence that the corporation made subsequent money transfers to the defendant's business). However, Lindsey was dismissed from this case, so the court must determine whether Manger, Kramer, and Murphy were knowing participants in the scheme. The court concludes that Hunt and Taylor sufficiently allege that Manger was a knowing participant in this scheme. Specifically, they allege that CCDN, LLC does business as CCDN, Manger was the co-founder of "CCDN," and that he hired Lindsey to sell the CCDN program. *Id.* ¶¶ 60, 84, 115–16.[16]

Hunt and Taylor, however, do not sufficiently allege that Kramer and Murphy were knowing participants in this particular scheme to defraud. Kramer and Murphy are either agents or officers of Aegis and Debt Jurisprudence (*id.* ¶¶ 81–82) and there are no allegations to support the contention that they were aware of Lindsey's scheme to defraud.

Because the Amended Complaint adequately sets forth that Manger was a knowing participant in a scheme to defraud, each mailing or wire transmission in furtherance of the fraud scheme constitutes a separate offense, and is attributable to him if he personally placed the matter in the mails or personally placed the wire transmission, or if he knew or reasonably should have known of the use of the mails or wires in connection with the scheme. *See Jefferson*, 674 F.3d at 367; *Perkal*, 530 F.2d at 606–07. With regard to wire fraud, Hunt alleges that Lindsey falsely asserted that she would "avoid bankruptcy and arbitration through [the CCDN] process" in an email Lindsey sent to her. Am. Compl. ¶¶ 223–27, D.E. 23. Hunt also alleges that

---

[16] The court notes that the allegations regarding Lindsey's scheme to defraud and Manger's knowing participation in the scheme are alleged by all Plaintiffs. However, RICO requires that the racketeering acts proximately harm the plaintiff, *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992) and only Hunt and Taylor interacted with Lindsey. Southwood also interacted with Lindsey, but, as will be discussed, she is precluded from asserting this claim.

"CCDN" provided "false and misleading legal advice" in furtherance of the scheme that was transmitted over interstate wires, presumably via email. *Id.* ¶ 243. Taylor alleges that the Purchase Agreement falsely asserted that he would be provided with a federally-licensed attorney and that the CCDN Enrollment Manual falsely asserted that the "CCDN Debt Reconciliation Program" would "dramatically improve" his credit and resolve his debt. *Id.* ¶¶ 378–79, 398–99. He alleges that the Purchase Agreement and the CCDN Enrollment Manual were both sent to him via email. *Id.* ¶¶ 373, 390. Moreover, the facts alleged as a whole allow the plausible inference that Manger knew, or should have known, that Lindsey was using the interstate wires to conduct and further the scheme. Furthermore, because Manger was the owner and manager of CCDN, LLC, which does business as CCDN (*id.* ¶¶ 60, 68), Manger knew or should have known of the provision of "false and misleading legal advice" in furtherance of the debt relief and credit restoration scheme. Accordingly, both Hunt and Taylor sufficiently allege two instances of wire fraud attributable to Manger.

Hunt and Taylor have not alleged sufficient facts, however, to sufficiently plead mail fraud as a predicate act. While they do allege that Defendants, as a general part of the scheme, mailed its customers a Notice of Demand letter and accompanying affidavit to be sent to creditors, (*id.* ¶¶ 173–77), they do not allege that Defendants mailed a letter to them. Rather, they allege that they were "provided" with CCDN materials (*id.* ¶¶ 231, 406). There is no indication whether this provision occurred via the mails or via wires, or in person. Without such specificity, the court cannot conclude that Hunt and Taylor have alleged sufficient facts to plead mail fraud as a predicate act.

(b)    **Harrison Sufficiently Alleges that Kramer, Murphy, and Manger Committed Wire Fraud**

Harrison alleges that he interacted with "CCDN" and Aegis; he does not allege that he

interacted with Lindsey. He clearly alleges that Aegis and Debt Jurisprudence sold the "Debt Jurisprudence process, a fraudulent debt elimination scheme" (*id.* ¶ 292) and that the "Debt Jurisprudence process" is another name for the CCDN program (*id.* ¶ 291). Harrison's allegations regarding wire fraud focus on a misrepresentation on the "Aegis/Debt Jurisprudence" website, which implies that the program has a 100% success rate. *Id.* ¶ 295. Because Harrison does not allege that Kramer, Murphy, or Manger personally placed the wire transmission, the court must determine whether they knew or reasonably should have known of the use of wires in connection with the scheme.

Harrison meets the sufficiency threshold as to Kramer and Murphy. Harrison alleges that Kramer sold the program, directed Harrison to send money, presumably to enroll in the Debt Jurisprudence process, and that Kramer provided more information about the Debt Jurisprudence process. *Id.* ¶¶ 291, 297, 305. Similarly, Harrison alleges that Murphy is an officer of Aegis and Debt Jurisprudence, that she sold CCDN's program, and that she received part of the proceeds from Harrison's payment to Aegis. *Id.* ¶¶ 82, 291, 301. Therefore, these allegations are sufficient to show that Kramer and Murphy knew or should have known of the use of the website to lure consumers to buy the CCDN program, in furtherance of the scheme.

The allegations as to Manger do not pass the sufficiency threshold with regards to the Aegis/Debt Jurisprudence website. Harrison alleges that Aegis, Debt Jurisprudence, Murphy, and Kramer sold the CCDN program pursuant to a contract with R.K. Lock & Associates (*id.* ¶ 291), and there are no allegations connecting Manger to R.K. Lock & Associates. Harrison, however, does allege that Manger knew or reasonably should have known of an instance of wire fraud. He alleges that Tracy Webster—a dismissed defendant—provided him with "false and misleading advice, dispatched by the interstate wires," presumably via email, "in furtherance of the CCDN

scheme." *Id.* ¶ 323. He further alleges that Webster was an employee or agent of CCDN, LLC (*id.* ¶ 70) and that Manger was the owner and manager of CCDN, LLC (*id.* ¶ 60, 68). Accordingly, Manger knew or reasonably should have known of the "false and misleading legal advice" in furtherance of the scheme. However, Kramer and Murphy did not know or reasonably should not have known of this instance of wire fraud because, as already explained, there are no allegations connecting Kramer and Murphy with Manger.

Harrison has not alleged sufficient facts, however, to sufficiently plead mail fraud as a predicate act. While he does allege that Defendants, as a general part of the scheme, mailed their customers a Notice of Demand letter and accompanying affidavit to be sent to creditors, (*id.* ¶¶ 173–77), he does not allege that Defendants mailed a letter to him. Rather, he alleges that he was "provided" with CCDN materials (*id.* ¶ 309). There is no indication whether this provision occurred via the mails or via wires, or in person. Without such specificity, the court cannot conclude that Harrison has alleged sufficient facts to plead mail fraud as a predicate act. Therefore, Harrison sufficiently alleges one instance of wire fraud attributable to Kramer and Murphy, and one instance of wire fraud attributable to Manger.

### (c) Lucas and the Beasleys Fail to Sufficiently Allege Acts of Wire Fraud or Mail Fraud

Lucas and the Beasleys do not sufficiently allege the predicate acts of wire or mail fraud. Lucas alleges that the website of FDRS—a marketing contractor of CCDN, LLC—contained false statements. *Id.* ¶¶ 60, 259, 266. However, Lucas fails to allege which statements were false; thus failing to plead the predicate act of wire fraud with particularity. *See Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) ("Plaintiffs' conclusory allegations [regarding their RICO claim] fail to satisfy Fed. R. Civ. P. 9(b)'s requirement that averments of fraud be stated with particularity."); *see also Proctor v. Metro. Store Corp.*, 645 F. Supp. 2d 464, 473

("When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity, pursuant to Rule 9(b)."). Furthermore, Lucas does not allege that Defendants sent information to her through the mail.

The Beasleys' allegation of wire fraud arises from a statement made on the website legallyerasedebt.com. Am. Compl. ¶¶ 455–56, D.E. 23. However, the allegations show that the website was associated with R&G Marketing—a dismissed defendant. *See Id.* ¶ 458 ("Hopeful that they might have found what they needed [after reading the website], the Beasleys telephoned the number given, and were put in communication with R&G marketing.") The Beasleys further allege that R&G Marketing contracted with Lindsey to sell the CCDN program. *Id.* ¶ 459. Although, as was already explained, Manger knew or should have known of Lindsey's fraudulent actions in furtherance of the scheme, it cannot be said that Manger should have been aware of Lindsey's subcontractor's actions and there are also no facts alleging that Manger knew of R&G Marketing's actions. Furthermore, similar to Lucas, the Beasleys do not allege that Defendants sent them information through the mail. The court, therefore, determines that Lucas and the Beasleys fail to allege the predicate acts of wire fraud and mail fraud.

### (3)    Money Laundering (18 U.S.C. §§ 1956, 1957)

Plaintiffs assert the Defendants committed money laundering, in violation of 18 U.S.C. § 1956(a)(1), (a)(2), (h) and § 1957. Section 1956(a) prohibits certain types of financial transactions and § 1956(a)(2) prohibits certain types of transaction to, through, or from a place outside the United States. *Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008); 18 U.S.C. §§ 1956(a)(1), (a)(2). A defendant violates § 1957 when he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Finally, § 1956(h) prohibits

conspiring to violate § 1956 or § 1957.

Plaintiffs fail to allege that Kramer, Murphy, or Manger violated 18 U.S.C. § 1956(a)(2) or § 1957. The Amended Complaint is devoid of any allegations that remotely suggest that money was transferred or attempted to be transferred to, through, or from a place outside of the United States. Similarly, there are no facts to suggest that Kramer, Murphy, Manger—or any other defendant for that matter—engaged or attempted to engage in a monetary transaction of over $10,000. *See* Am. Compl. ¶¶ 220, 267, 300, 344, 387, 468, D.E. 23 (alleging that Lindsey received $2,500 from Lucas and $5,600 from Southwood; Aegis received $4,200 from Harrison; TCCS received $4,500 from Taylor; and "Defendants"—later clarified as Russ—received over $5,000 from the Beasleys).[17]

In order to sufficiently allege money laundering under 18 U.S.C. § 1956(a)(1), a plaintiff must allege:

> (1) the defendant conducted or attempted to conduct a financial transaction;
> (2) the transaction involved the proceeds of a specified unlawful activity; (3)
> the defendant knew at the time of the transaction that the property involved
> proceeds of an unlawful activity; and (4) the defendant intended to promote
> the carrying on of the specified unlawful activity.

*United States v. Singh*, 518 F.3d 236, 246 (4th Cir. 2008). The definition of "specified unlawful activity" includes a number of different criminal activities, such as wire fraud. 18 U.S.C. § 1956(c)(7)(a).

Plaintiffs fail to sufficiently allege that Manger and Murphy committed money laundering—there are no allegations that either defendant "conducted or attempted to conduct a

---

[17] In order to show a violation § 1957, the Government must plead that each monetary transaction involved more than $10,000. *United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-4007381 in the Name of Ishar Abdi & Barbara Abdi, et al.*, 255 F. Supp. 2d 56, 66 (E.D.N.Y. 2003). Even if this rule did not apply to a RICO plaintiff, no defendant received an aggregate sum of over $10,000.

financial transaction." Harrison, however, alleges that Kramer directed him to send money in order to enroll in the Debt Jurisprudence program. Am. Compl. ¶ 297, D.E. 23. Harrison does not allege, though, that Kramer attempted to conduct this financial transaction with the intent of promoting wire fraud. Instead, he alleges that Kramer received Harrison's check after "completing the offense[] of … wire … fraud … all for the promotion and carrying on of their and CCDN's … wire … fraud …." *Id.* at § 303. However, this receipt of the check happened *after* Kramer's attempt to conduct a financial transaction, *id.* ¶¶ 297, 300, 303, so this intent cannot be applied to Kramer's attempt to conduct a financial transaction. Finally, there are no allegations suggesting that Kramer, Murphy, and Manger conspired to money launder. Therefore, Plaintiffs fail to allege that Kramer, Manger, or Murphy violated 18 U.S.C. §§ 1956(a)(1), (a)(2), (h), 1957.

### e) Pattern of Racketeering

To demonstrate a pattern of racketeering activity, a plaintiff must allege, at a minimum, that each RICO defendant committed two acts of racketeering activity within a 10-year period. 18 U.S.C. § 1961(5); *Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997); *see also GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (expressing reservations about RICO claims where the predicate acts are isolated acts of mail fraud or wire fraud "because it will be the unusual fraud that does not enlist the mails and wires in its services at least twice"). Additionally, the plaintiff must allege "'that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)) (emphasis in original). Continuity is "both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past

conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241; *see supra* Part IV.A.

Harrison fails to allege that Murphy and Kramer had a pattern of racketeering as he only alleges that they each committed only one act of wire fraud. *See* 18 U.S.C. § 1961(5). However, Harrison, Hunt, and Taylor do sufficiently allege that Manger had a pattern of racketeering. Although Hunt and Taylor both allege two counts of wire fraud attributable to Manger, and Harrison only alleges one count of wire fraud attributable to Manger, the allegations in the Amended Complaint show that these wire frauds were all in furtherance of the CCDN scheme. Further, the facts as alleged establish that the entire purpose of the CCDN program was to promise debt relief and credit restoration when, in most cases, it could not be delivered. Plaintiffs also allege that CCDN promotes its program on numerous websites and has a widespread reach. Am. Compl. ¶¶ 106–09, 488, D.E. 23. Therefore, the court determines that Hunt, Taylor, and Harrison sufficiently allege the "pattern" element of a RICO claim as to Manger.

### f) Proximate Cause

Finally, RICO requires that the racketeering acts proximately harm the plaintiff. *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Hunt, Taylor, and Harrison all adequately plead this as they allege that they relied on the misrepresentations contained in the email (Hunt), the misrepresentations in the Purchase Agreement (Taylor), and the legal advice (Harrison). Am. Compl. ¶¶ 227, 323, 328, 386, D.E. 23. Hunt, Taylor, and Harrison have, therefore, pled sufficient facts to state a claim against Manger under § 1962(c).

### 2. Section 1962(d) Claim

Under § 1962(d), it is unlawful to conspire to violate any provision of § 1962(a), (b), or (c) of RICO. To plead a violation of § 1962(d), a plaintiff must allege that "each defendant agreed that another coconspirator would commit two or more acts of racketeering." *United States v. Pryba*, 900

52

F.2d 748, 760 (4th Cir. 1990). A defendant may be liable for a RICO conspiracy even if he does not have a role in directing the RICO enterprise. *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012). There are no allegations to suggest that Manger conspired with any of the remaining defendants to violate RICO. Furthermore, as already discussed, Southwood is precluded from bringing this claim. *See supra* Part V.B.

F.     **NC RICO**

Plaintiffs also allege a violation of the North Carolina Racketeer Influenced and Corruption Organizations Act, N.C. Gen. Stat. §§ 75D-1 *et seq.* ("NC RICO"). NC RICO forbids any person from "engag[ing] in a pattern of racketeering activity," conducting or participating in an enterprise through a pattern of racketeering activity, or conspiring to do the same. N.C. Gen. Stat. § 75D-4(a). It also provides a private right of action for "[a]ny innocent person who is injured or damaged in his business or property by reason of any violation of G.S. 75D-4 involving a pattern of racketeering activity...." N.C. Gen. Stat. § 75D-8(c).

Under the NC RICO statute, "pattern of racketeering activity" is defined as "engaging in at least two incidents of racketeering activity that have the same or similar purposes, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics" within a four-year period. N.C. Gen. Stat. § 75D-3(b). However, the pattern of racketeering must include "at least one act of racketeering activity other than (i) an act indictable under 18 U.S.C. § 1341 or U.S.C. § 1343...." N.C. Gen. Stat. § 75D-8(c). In other words, the pattern of racketeering activity must include at least one act other than wire fraud. The Amended Complaint does not contain allegations that would satisfy this requirement. Therefore, Plaintiffs fail to sufficiently allege a violation of NC RICO and are not entitled to a default judgment on this claim.

### G.     Credit Repair Organization Act

Plaintiffs contend that Defendants violated sections 1679b(a)(3), (a)(4), and (b) of the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1692 *et seq.* Mem. Supp. Mot. Default Judg. at 2–3, *Southwood* D.E. 61. Section 1679b(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization," while § 1679b(a)(4) prohibits any person from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes a result in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. §§ 1679b(a)(3), (4). Section 1679b(b) prohibits credit repair organizations from charging or receiving "any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." *Id.* at § 1679b(b). After review, the court determines that all Plaintiffs sufficiently allege that CCDN, LLC violated the CROA, and that Harrison also sufficiently alleges that Aegis violated the CROA.

### 1.     Credit Repair Organizations Under the CROA

Under the CROA, a "credit repair organization" is any person who (1) "used any instrumentality of interstate commerce or the mails to" (2) "sell, provide, or perform (or represent that such person can or will sell, provide, or perform)" (3) any service or advice about a service (4) "for the express or implied purpose of improving any consumer's credit record, credit history, or credit rating" (5) "in return for payment of money or other valuable consideration." 15 U.S.C. § 1679ba(3); *see also Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 511 (N.D. Ga. 2006). The credit repair organization does not have to receive consideration directly from the consumer, as the statute only requires "that the credit repair

organization receive consideration." *Parker v. 1-800 Bar None, a Fin. Corp., Inc.*, No. 01-C-4488, 2002 WL 215530, at *4 (N.D. Ill. Feb. 12, 2002).

The allegations in the Amended Complaint show that two of the Defendants—CCDN, LLC and Aegis—are credit repair organizations under the CROA. The Amended Complaint alleges that CCDN, LLC, doing business as CCDN (Am. Compl. ¶ 60, D.E. 23), claimed on its website that it "restores credit" and that in its experience "numerous negatives will be removed from a typical customers [sic] credit reports [sic] within the first 3 to 4 months of the process" (*id.* ¶¶ 91, 96). As this court stated previously, "[i]t is difficult to construe a 'credit restoration' program as being anything other than a service, or program which includes advice about a service, to improve credit records, credit history, or credit ratings." *Southwood* Order at 31, D.E. 46. Furthermore, CCDN, LLC received payment for its services. Am. Compl. at ¶¶ 60, 96, 173, 229, 303, 346, D.E. 23. Similarly, Harrison alleges that Aegis advertised on its website that it "restores your credit" (*id.* ¶ 295) and that Aegis received consideration for its services (*id.* ¶¶ 297, 309).

Plaintiffs also appear to allege that Legal Debt Cure, Debt Jurisprudence, Kramer, and Murphy are also credit repair organizations: they allege that Legal Debt Cure asserted that it could "reduce or remove unsecured debt" (*id.* ¶¶ 151, 159, 161) and that Debt Jurisprudence, Kramer, or Murphy violated § 1679b(b) of the CROA (*id.* ¶ 302). However, Plaintiffs do not allege that Legal Debt Cure received compensation for its services. Nor do they allege that Debt Jurisprudence, Kramer, and Murphy received compensation for their services. *See id.* ¶ 300 ("Harrison wrote check number 8246 made payable to Aegis Corporation … in return for eliminating his credit card debt as promised."). Accordingly, the court should find that only CCDN, LLC and Aegis are credit repair organizations.

## 2. CROA Claims Under § 1679b(a)(3) and (a)(4)

Section 1679b(a)(3) and (a)(4) prohibit any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization," 15 U.S.C. § 1679b(a)(3), and from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes a result in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization," 15 U.S.C. § 1679b(a)(4). Although some courts have taken an expansive view that proscriptions in § 1679b(a) apply to "any person," *see, e.g.*, *Bigalke v. Creditrust Corp.*, 162 F. Supp. 2d 996, 999 (N.D. Ill. 2001), this court previously has determined that the prohibited practices in § 1679b(a) apply "only to 'persons' acting in the context of credit repair organizations and services." *Bentley v. Alan Vester Auto Grp., Inc.*, No. 5:07-CV-434-F, 2009 WL 3125539, at *2 (E.D.N.C. Sept. 29, 2009) (incorporating *Lopez v. ML #3, LLC*, 607 F. Supp. 2d 1310, 1311–14 (M.D. Fla. 2009)).

### a) Claims Against Aegis and CCDN, LLC Under § 1679b(a)(3) and (a)(4)

After review, the court determines that the Beasleys and Taylor sufficiently allege that CCDN, LLC violated § 1679b(a)(3) and (a)(4) and that Harrison sufficiently alleges that Aegis violated § 1679b(a)(3) and (a)(4). Southwood is barred from asserting a violation of these subsections under the doctrine of claim preclusion for the same reasons set forth in the previous section. *See supra* Part V.B.

### (1) The Beasleys and Taylor Sufficiently Allege that CCDN, LLC Violated § 1679b(a)(3) and (a)(4)

The Beasleys sufficiently allege that CCDN, LLC violated § 1679b(a)(3) and (a)(4). They allege that they read one of the websites that CCDN, LLC used to promote and solicit business, which stated that the debt relief process will "Restore their credit – Fico [sic] score above 750!"

56

*Id.* ¶¶ 60, 105, 106, 108, 455, 456. This statement is misleading because the Beasleys did not provide CCDN, LLC with any documentation from which it could predict the result of a FICO score above 750. *Cf. Fed. Trade Comm'n v. 1st Gaur. Mortg. Corp.*, No. 09-cv-61840, 2011 WL 1233207, at *10 (S.D. Fla. Mar. 30, 2011) (determining a credit repair organizations violated § 1679b(a)(3) when it claimed that it could improve credit scores "by removing negative, accurate information from credit reports" when it "lacked the documentation about negative items on consumers' credit reports on which to base [its] representation"). Accordingly, the Beasleys sufficiently allege that CCDN, LLC violated § 1679b(a)(3) and (a)(4) of the CROA.

Taylor sufficiently alleges that CCDN, LLC violated § 1679b(a)(3) and (a)(4). The Purchase Agreement, which was between him and Lindsey, an "Authorized Agent" of CCDN, LLC, promised that Taylor would be provided with a "Federally licensed attorney … at NO additional attorney fee cost to [Taylor]." *Id.* ¶¶ 60, 374, 378. However, "Defendants never intended to provide a lawyer for Mr. Taylor and knew that they had no lawyer to refer him to." *Id.* ¶ 379. Accordingly, the court determines that Taylor sufficiently alleges that CCDN, LLC violated § 1679b(a)(3) and (a)(4).

### (2) Harrison Sufficiently Alleges that Aegis Violated § 1679b(a)(3) and (a)(4)

Harrison sufficiently alleges that Aegis violated § 1679b(a)(3) and (a)(4). He asserts that Aegis's website advertised that its "nationwide network of licensed attorneys and certified paralegals" in its Debt Jurisprudence process, which "gets you out of debt and restores your credit," has a "success rate [of] 100%." Am. Compl. ¶ 295, D.E. 23. He also alleges that the Debt Jurisprudence process "would have required Mr. Harrison to generate and collect—net of all taxes—over $120,000 of consumer protection law violations, a legally impossible task" *Id.* ¶ 298. These allegations show that Aegis's statement on its website are misleading and are in

57

connection with an offer of services of a credit repair organization. Aegis therefore violated §
1679b(a)(3) and (a)(4).

### (3) Hunt, Lucas, and Southwood Fail to Allege that CCDN, LLC or Aegis Violated § 1679b(a)(3) or (a)(4)

Hunt, Lucas, and Southwood generally allege various statements that they assert are misrepresentative and deceptive. However, Hunt and Lucas do not allege that they were damaged by those allegedly misrepresentative and deceptive statements. *See* 15 U.S.C. § 1679g(a) ("Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to" actual damages and "additional" punitive damages). Instead, Hunt and Lucas both allege that CCDN, LLC's misrepresentative statements occurred after they joined the CCDN program. Am. Compl. ¶¶ 227, 233–34, 267, 274, D.E. 23. CCDN, LLC misrepresented to Hunt that its "paralegals conduct a compliance audit of each account of each customer" and then uses the audits "to compose a solid Federal Complaint." *Id.* ¶¶ 233, 234. However, Hunt fails to allege how those statements caused her damages. Similarly, CCDN, LLC misrepresented to Lucas that "creditors and collectors always commit enough [Fair Debt Collection Practices Act] violations to offset any debt." *Id.* ¶ 274. Lucas asserts that the misrepresentations cost her "over $8,000 [in] worthless services" (*id.* ¶ 283) but also contends that she paid "over $8,000" to join the CCDN program (*id.* ¶ 267). Accordingly, the court determines that Hunt, Lucas, and Southwood fail to sufficiently allege violations of § 1679b(a)(3) and (a)(4) and they are not entitled to a default judgment on these claims.

### b) Claims Against Individual Defendants Under § 1679b(a)(3) and (a)(4)

After review, the court determines that no individual defendant violated § 1679b(a)(3) and that Manger violated § 1679b(a)(4). The Amended Complaint does not contain any factual

allegations indicating that Wasik, Brisco, Manger, Kramer, or Murphy made or used any false or misleading statements regarding the services of a credit repair organization. Lindsey did make misleading or untrue statements (*see supra* Part V.E; *see infra* Part V.I), but there are no similar allegations regarding statements by these individual defendants. The Amended Complaint does allege that Manger directed Hunt to email Lindsey (Am. Compl. ¶ 223, *Taylor* D.E. 23) and that Kramer told Harrison that an integral part of the CCDN program "is to accelerate the transfer of accounts … to a debt collector" (*id.* ¶ 305). However, these vague allegations do not contain sufficient allegations to allow the court to infer that Manger's and Kramer's statements violated § 1679b(a)(3). Therefore, Plaintiffs are not entitled to a default judgment against Wasik, Brisco, Manger, Kramer, or Murphy on their claim under § 1679b(a)(3).

Hunt, Lucas, Harrison, Taylor, and the Beasleys are, however, entitled to a default judgment against Manger on their claim under § 1679b(a)(4).[18] The Amended Complaint alleges that Manger owned and operated one or more businesses that existed exclusively for marketing and selling fraudulent credit repair services. Am. Compl. *passim*. These allegations are sufficient to state a claim for a violation §1679b(a)(4) against Manger and, therefore, Plaintiffs are entitled to a default judgment on this claim.

### 3. CROA Claims Under § 1679b(b)

Plaintiffs assert that Defendants violated § 1679b(b), which prohibits credit repair organizations from receiving payment or consideration for their services before those services are fully performed. In order to assert a violation of this section, the credit repair organization must also have agreed to perform services for the plaintiff. 15 U.S.C. § 1679b(b).

---

[18] Southwood is again precluded from bringing this claim. *See supra* Part V.B.

#### a)     Claims Against Aegis and CCDN, LLC Under § 1679b(b)

After review, the court determines that Hunt, Lucas, Harrison, and Taylor all sufficiently allege that CCDN, LLC violated § 1679b(b). Harrison also sufficiently alleges that Aegis violated § 1679b(b). Southwood is barred from asserting a violation of these subsections under the doctrine of claim preclusion for the same reasons set forth in the previous section. *See supra* Part V.B.

#### (1)     Taylor, Hunt, Lucas, and Harrison Sufficiently Allege that CCDN, LLC Violated § 1679b(b)

Taylor, Hunt, Lucas, and Harrison all sufficiently allege that CCDN, LLC violated § 1679b(b). Taylor alleges that he paid Lindsey $4,500.00 by means of an electronic draft from his bank account. Am. Compl. ¶ 387, D.E. 23. He also alleges that the purchase agreement preceding his payment was between himself and Lindsey, an authorized agent of "CCDN," and that CCDN, LLC does business as CCDN. *Id.* ¶¶ 60, 374. The plausible inference from these allegations is that Taylor paid the credit repair organization CCDN, LLC, via its authorized agent, prior to CCDN, LLC performing any services for him. The court, therefore, concludes that Taylor has stated a claim for a violation of § 1679b(b) as to CCDN, LLC.

Hunt, Lucas, and Harrison also sufficiently allege that CCDN, LLC violated § 1679b(b). They allege that they paid various middlemen for access to debt relief services: Hunt paid Lindsey, Lucas paid FDRS, and Harrison paid Aegis. Am. Compl. ¶¶ 229, 270, 303., D.E. 23. Although those middlemen were either dismissed (Lindsey), not named in this action (FDRS), or not agents of CCDN, LLC (Lindsey, FDRS, and Aegis), Hunt, Lucas, and Harrison allege that they received materials or services from "CCDN" *after* they paid the middlemen for debt relief services. *Id.* ¶¶ 227, 231, 267, 272, 300, 309. They also contend that "CCDN" received part of the fees paid to the middlemen and that CCDN, LLC does business as CCDN. *Id.* ¶¶ 60, 229,

268, 303. The plausible inference from these allegations is that CCDN, LLC agreed to perform services for Hunt, Lucas, and Harrison and received money before those services were fully performed.

Harrison also sufficiently alleges that Aegis violated § 1679b(b) as he asserts that he was required to pay Aegis before receiving any services. *Id.* ¶ 300. The court, therefore, concludes that Hunt, Lucas, and Harrison state a claim for a violation of § 1679b(b) as to CCDN, LLC and that Harrison also states a claim for a violation of § 1679b(b) as to Aegis.

### (2) The Beasleys Fail to Allege that CCDN, LLC or Aegis Violated § 1679b(b)

The Beasleys, however, do not sufficiently state a claim for a violation of § 1679b(b). Although they assert that they paid a middleman and that they talked to a representative of CCDN—the business name of CCDN, LLC—(*id.* ¶¶ 60, 468, 476), there are no allegations that allow for the inference that CCDN, LLC or Aegis agreed to provide services for them.

### b) Claims Against Individual Defendants

Plaintiffs do not allege that the remaining individual defendants—Kramer, Murphy, Manger, Wasik, and Brisco—were personally paid for credit repair services. Therefore, they fail to state a claim against them under § 1679b(b) and, consequently, are not entitled to a default judgment on this claim against the individual defendants. *See* 15 U.S.C. § 1679b(b) (prohibiting a "credit repair organization" from "charg[ing] or receiv[ing] any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed").

### H. Unfair and Deceptive Trade Practices

Hunt, Lucas, Harrison, and Southwood next assert that Defendants violated the North

Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*[19] North Carolina General Statute Section 75-1.1(a) provides: "Unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a); *see also* N.C. Gen. Stat. § 75-16 (providing for a private cause of action). To state a claim for unfair and deceptive trade practices, a plaintiff must allege sufficient facts showing: (1) that a defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) that the act proximately caused injury to plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). An unfair act or practice "offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). A deceptive act or practice "has the capacity or tendency to deceive." *Id.* An act is in or affecting commerce if it is in or affects "all business activities, however denominated" with the exception of "professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). Finally, the act must cause a legally cognizable injury, not an injury that is "speculative and illusory." *Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386, 397, 617 S.E.2d 306, 313–14 (2005). After review, the court determines that Harrison sufficiently alleges a UDTPA claim against Aegis and CCDN, LLC.

### 1. Harrison Sufficiently Alleges that Aegis and CCDN, LLC Violated the UDTPA

Harrison sufficiently alleges a UDTPA claim against Aegis and CCDN, LLC. Harrison

---

[19] In the Amended Complaint, all Plaintiffs appear to assert this violation. Am. Compl. ¶ 766, D.E. 23. However, Plaintiffs clarified in their Memorandum Supporting Claims for Final Default Judgment that only Southwood, Harrison, Lucas, and Hunt are asserting this claim. Mem. Supp. Cl. Final Def. Judg. at 2, *Southwood* D.E. 65.

asserts that Aegis's website advertised that its "nationwide network of licensed attorneys and certified paralegals" in its Debt Jurisprudence process, which "gets you out of debt and restores your credit," had a "success rate [of] 100%." Am. Compl. ¶ 295, D.E. 23. He also alleges that the Debt Jurisprudence process "would have required Mr. Harrison to generate and collect—net of all taxes—over $120,000 of consumer protection law violations, a legally impossible task." *Id.* ¶ 298. These allegations show that Aegis's statement on its website, at the very least, had a tendency to deceive. Finally, Harrison alleges that he relied on the representations on Aegis's website and paid to enroll in the program. *Id.* ¶ 300. Therefore, Harrison sufficiently alleges that Aegis violated the UDTPA.

Harrison also sufficiently states a UDTPA claim against CCDN, LLC. He alleges that CCDN, LLC does business as CCDN and that CCDN directed him to stop paying his credit card debt. *Id.* ¶¶ 60, 309, 310, 315. This direction is "substantially injurious to consumers," *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981), because fees and interest can be added to the balance and the credit card company may sue for collection. In short, following such a direction may lead to financial ruin. Furthermore, unlike Hunt, Harrison also alleges that he suffered measurable damages from following that direction. *Id.* ¶¶ 315, 328, Mot. Final Def. Judg. at 2, *Southwood* D.E. 60. The court, therefore, determines that Harrison sufficiently alleges that CCDN, LLC violated the UDTPA.

### 2. Southwood, Lucas, and Hunt Fail to State a Claim for a Violation of the UDTPA

Southwood, Lucas, and Hunt all fail to state a claim for a violation of the UDTPA. However, each plaintiff's claim fails for a different reason. Southwood's claim is barred by the doctrine of claim preclusion because she could have brought this claim in her earlier action. *See supra* Part V.B. Lucas's claim fails because the individual who allegedly committed the

violation—FDRS and Cella—are neither parties to this action, nor agents of any of the remaining defendants. Hunt's claim fails because the action that allegedly caused her injury—the instruction to stop paying her credit cards—occurred after she paid CCDN for its services. Thus, none of these Plaintiffs are entitled to a default judgment on this claim.

Lucas only interacted with FDRS and Cella, both of whom were never named in this action. Am. Compl. §§ 261–64, D.E. 23. As already discussed, FDRS and Cella were not acting as agents on the behalf of any of the remaining defendants. Thus, their actions cannot form a basis for relief, and Lucas is not entitled to a default judgment on this claim.

Unlike Lucas, Hunt interacted with CCDN—the business name of CCDN, LLC—and asserts that CCDN told her to stop paying her credit card debt (*id.* ¶¶ 60, 261–64). That direction, if followed, is substantially injurious to the consumer. However, Hunt fails to show that CCDN, LLC's direction proximately caused her injury: Hunt received the direction *after* she paid to join the program (Am. Compl. ¶¶ 227, 236, D.E. 23), and she only seeks to recover the amount she paid to join the program plus legal fees (Mot. Def. Judg. at 1, D.E. 60). *See* N.C. Gen. Stat. § 75-16 ("If any person shall be injured … by reason of any act or thing done by any other person, firm, or corporation in violations of the provisions of this Chapter, such person … so injured shall have a right of action on account of such injury done…."); *see also Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 164 (4th Cir. 2012) (stating that under the UDTPA, "'occurrence of the alleged conduct, damages, and proximate cause are fact questions for the jury'" (quoting *Gilban Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 402 (4th Cir. 1996)); *In re Bebber*, 192 B.R. 120, 122 (Bankr. W.D.N.C. 1995) ("In a claim for unfair trade practices pursuant to N.C. Gen. Stat. § 75-16, the jury must find that the defendant engaged in certain conduct which was the proximate cause of damages to the plaintiff.") Therefore, Southwood,

Lucas, and Hunt fail to sufficiently allege a UDTPA claim and are not entitled to a default judgment on this claim.

## I.      Fraud

Plaintiffs also assert a claim for fraud. Under North Carolina law, the elements of fraud include: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injury [sic] party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). "Additionally, any reliance on the allegedly false representations must be reasonable." *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007). A principal may be held liable for "injuries resulting from the fraud of his agent committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal." *Lee v. Keck*, 68 N.C. App. 320, 325, 315 S.E. 2d 323, 327 (quoting *Vickery v. Olin Hill Constr. Co.*, 47 N.C. App. 98, 102, 266 S.E. 2d 711, 714, *disc. rev. denied*, 301 N.C. 106 (1980)) (internal quotation marks omitted). The court determines that Taylor is the only plaintiff that sufficiently alleges a claim for fraud.

### 1.      Southwood, Lucas, Hunt, Harrison, and the Beasleys Fail to State a Claim for Fraud

Plaintiffs Hunt, Lucas, Harrison and the Beasleys all fail to sufficiently allege a claim for fraud. Southwood is precluded from bringing this claim because she asserted it in the *Southwood* action. *See supra* Part V.B. Lucas's claim for fraud fails because it stems from statements made by FDRS (Am. Compl. ¶¶ 264, 267, D.E. 23), an entity that was not named in this lawsuit. Additionally, as already explained, FDRS was not an agent acting on behalf of CCDN, LLC. Therefore, Lucas fails to state a claim for fraud against any of the remaining defendants.

Hunt also fails to state a claim of fraud against the remaining defendants. She alleges that

Lindsey—a dismissed defendant—and CCDN, LLC both made false misrepresentations. She alleges that Lindsey falsely asserted that Hunt "will avoid bankruptcy and arbitration through [the CCDN] process" (Am. Compl. at ¶¶ 223, 224, 225, D.E. 23) and that CCDN—the business name of CCDN, LLC—falsely represented that its paralegals would complete an audit of her case (*id.* ¶¶ 60, 233, 234). Hunt's claim against CCDN, LLC fails because she does not allege that she reasonably relied on CCDN, LLC's statements regarding an audit. Hunt does state a claim for fraud against Lindsey because she alleges that Lindsey made his statement with the intent to deceive, that she reasonably relied upon his representation, and that she suffered damages as a result (*id.* ¶¶ 224, 227). However, the court dismissed Lindsey from this lawsuit (D.E. 120) and Hunt fails to allege in the Amended Complaint that Lindsey was an agent acting on the behalf of any of the remaining defendants.

Similarly, Harrison does not sufficiently allege facts to support a claim of fraud against the remaining defendants. He alleges that the Aegis website falsely represented that the "licensed attorneys and certified paralegals" who support "[t]he Debt Jurisprudence process" of removing debt and restoring credit have a "success rate [of] 100%." *Id.* ¶¶ 287, 295. Harrison further alleges that the program could not have a 100% success rate because using the process to eliminate his debt would have been a "legally impossible task." *Id.* ¶ 298. However, he fails to allege that Aegis knew that its representation was false.

The Beasleys also do not sufficiently state a claim for fraud. They allege that one of the Defendants' websites contained false statements. *Id.* ¶¶ 456, 457. However, they did not rely on those statements. *Id.* ¶ 460 (stating that the Beasleys telephoned the number on the website and "explained that they were encouraged by what they saw, but would require more assurance before turning over thousands of dollars"). The Beasleys also seem to imply that Russ and

Britt—two dismissed defendants—made false statements. However, fraud must be pled with particularity, Fed. R. Civ. Pro. 9(b), and the Amended Complaint fails to allege the specific statements that were false. Even if the Bealseys pled fraud with particularity, the court dismissed Russ and Britt from this suit and they were not acting as agents for the remaining defendants. Therefore, Lucas, Hunt, Harrison and the Beasleys do not sufficiently allege a claim for fraud against any of the remaining defendants.

### 2. Taylor Sufficiently Alleges a Claim for Fraud against CCDN, LLC

Taylor sufficiently states a claim for fraud against CCDN, LLC. He alleges that, in the Purchase Agreement, Lindsey "d/b/a The Credit Card Solution" promised to provide a federally licensed attorney, at no additional cost to Taylor, but "never intended to provide a lawyer." *Id.* ¶¶ 374, 378, 379. He further alleges that Lindsey intended him to rely on that statement (*id.* ¶ 386) and that he did, in fact, rely on the misrepresentation by executing the agreement and sending a $4,500 check to TCCS (*id.* ¶¶ 386, 387). As already explained, CCDN, LLC is vicariously liable for Lindsey's fraud as he was acting as CCDN, LLC's agent within the scope of his authority. Therefore, Taylor sufficiently alleges a claim of fraud against CCDN, LLC.[20]

### J. Legal Malpractice

Plaintiffs next assert a claim for legal malpractice against the remaining defendants. In order to state a claim for legal malpractice under North Carolina law, a plaintiff must allege facts showing "(1) that the attorney breached the duties owed to his client … and that this negligence (2) proximately caused (3) damage to the plaintiff." *Rorrer v. Cooke*, 313 N.C. 338, 355, 329

---

[20] The court notes that fraud is a violation of the UDTPA if "the alleged violator is engaged in 'commerce.' *Faucette v. 6303 Carmel Rd., LLC*, __ N.C. App. __, __, 715 S.E.2d 316, 324 (2015). However, Taylor clarified that he is not asserting a claim under the UDTPA. D.E. 65 at 2.

S.E.2d 355, 366 (1985). A legal malpractice claim, therefore, in most cases,[21] first requires the existence of an attorney-client relationship, which gives rise to a duty owed by an attorney to his client. Whether an attorney-client relationship exists is a question of fact, *Cornelius v. Helms*, 120 N.C. App. 172, 175, 461 S.E.2d 338, 339–40 (1995), *rev. denied*, 342 N.C. 653, 467 S.E.2d 709, *and reconsideration dismissed*, 342 N.C. 894, 467 S.E.2d 909 (1996), and "may be implied from conduct of the parties …." *North Carolina State Bar* v. *Sheffield*, 73 N.C. App. 349, 358, 326 S.E.2d 320, 325, *cert. denied*, 314 N.C. 117, 323 S.E.2d 482, *cert. denied*, 474 U.S. 981 (1985).

Although Wasik and Brisco are both attorneys, neither defendant provided legal services to Plaintiffs. Accordingly, Plaintiffs attempt to assert this claim against the remaining non-attorney defendants. North Carolina state courts have yet to directly address whether a legal malpractice claim may be asserted against one who is not a licensed attorney. In general, however, North Carolina law holds those who practice a particular profession without a license to the standard of care applicable to licensed professionals in negligence actions. *See, e.g.*, *Grier v. Phillips*, 230 N.C. 672, 679, 55 S.E.2d 485, 490 (1949) (stating in a wrongful death action that a defendant who practiced dentistry without a license to do so was required to exercise the care and skill of a licensed dentist). In any event, assuming that a plaintiff may bring a claim for legal malpractice against a non-attorney, the plaintiff must still show that the defendant's breach of duties owed to him proximately caused his damage.

Plaintiffs generally allege that Defendants "dispensed grossly erroneous legal advice,

---

[21] In certain circumstances, not implicated by the allegations in the Amended Complaint, a third-party non-client may recover from an attorney's negligence. *United Leasing Corp.* v. *Miller*, 45 N.C. App. 400, 406, 263 S.E.2d 313, 317 (1980).

intending each Named Plaintiff to follow same, proximately causing damage to each Named Plaintiff, and entitling each Named Plaintiff to recovery of actual damages." Am. Compl. ¶ 768, D.E. 23. The allegations in the Amended Complaint, however, do not give rise to the inference that the allegedly erroneous legal advice, dispensed after an attorney-client relationship arose, resulted in any damage to Southwood,[22] Taylor, Hunt, Lucas, or the Beasleys. Rather, in their Motion for Default Judgment, these Plaintiffs clarify that they seek the amount they paid to the various middlemen for access to a debt relief program plus legal fees. Pls. Mot. Default Judg. at 1–3, *Southwood* D.E. 60. Therefore, Southwood, Taylor, Hunt, Lucas, and the Beasleys fail to state a legal malpractice claim and they are not entitled to a default judgment on this claim.

Unlike the other Plaintiffs, Harrison seeks the amount he paid to Aegis plus measurable damages from following the CCDN program. *Id.* at 2. In the Amended Complaint, he asserts that those measurable damages resulted from following CCDN's direction to stop paying his credit card debts. Am. Compl. ¶¶ 315, 328, D.E. 23. However, there are no allegations that this advice was given in the context of an attorney-client relationship with any agent of CCDN, LLC. Accordingly, Harrison also fails to state a legal malpractice claim and is not entitled to a default judgment on this claim.

### K.    Piercing the Corporate Veil

Plaintiffs seek to pierce the corporate veil of the defendant entities CCDN, LLC, Aegis,

---

[22] The court notes that Southwood may be precluded from bringing this claim against CCDN, LLC and Philip Manager due to this court's dismissal of her legal malpractice claim against them in *Southwood v. The Credit Card Solution*. However, for the sake of brevity, the court will include Southwood in this analysis.

and Debt Jurisprudence in an effort to collect directly from the individual defendants.[23] As already explained, the court will apply the law of the state in which each corporation was incorporated when evaluating a piercing the corporate veil claim. *See supra* Part IV.C. Thus, the court will apply Nevada law when evaluating this claim against CCDN, LLC (Am. Compl. ¶ 60, D.E. 23) and Missouri law when evaluating this claim against Aegis and Debt Jurisprudence (*id.* ¶¶ 79, 80).

Under Nevada law, a court will find alter ego and pierce the corporate veil when (1) the corporation is "influenced and governed by the person asserted to be its alter ego;" (2) there is "such unity of interest and ownership that one is inseparable from the other;" and (3) an "adherence to the fiction of [the] separate entity would, under the circumstances, sanction a fraud or promote injustice." *Lorenz v. Beltio, Ltd.*, 963 P.2d 488, 496 (Nev. 1998) (quoting *Ecklund v. Nevada Wholesale Lumber Co.*, 562 P.2d 479, 479–80 (Nev. 1977)) (internal quotation marks omitted). Courts will look to factors such as "commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the individual's own, and failure to observe corporate formalities" when determining whether there is a unity of interest. *Id.* at 497.

The Amended Complaint alleges that Manger is an owner of CCDN, LLC. Am. Compl. ¶ 68, D.E. 23. Thus, the first requirement for finding alter ego and piercing the corporate veil is met. However, Plaintiffs fail to meet the second requirement—unity of interest and ownership— as they merely allege that Manger failed to follow corporate formalities. *Id.* ¶ 763. This is a legal conclusion, *Friend v. Remac America, Inc.*, 924 F. Supp. 2d 692, 700 (N.D. W. Va. 2013), that is

---

[23] Plaintiffs do not sufficiently allege any claims against Defendants Barrister Legal Services or Legal Debt Cure. Accordingly, the court will not address the piercing the corporate veil claim as to those entities.

not supported by the allegations contained within the Amended Complaint. Accordingly, Plaintiffs fail to sufficiently plead a claim for piercing the corporate veil of CCDN, LLC and the court should dismiss this claim. *See Local Union No. 98 Int'l Bhd. Of Elec. Workers v. RGB Servs.*, No. 10-3486, 2011 WL 292233, at *4 (E.D. Pa. Jan. 28, 2011).

Similar to Nevada law, a Missouri court will pierce the corporate veil when three factors are present:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the corporation to commit fraud or wrong, to perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*66, Inc. v. Crestwood Commons Redev. Corp*, 998 S.W.2d 32, 40 (Mo. 1999) (en banc) (emphasis omitted) (quoting *Collet v. Am. Nat'l Stores, Inc.*, 708 S.W.2d 273, 284 (Mo. App. 1986)); *see also Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013) (en banc) (applying factors to a piercing the corporate veil claim against the parent corporation of a subsidiary). Plaintiffs allege that Debt Jurisprudence is a subsidiary of Aegis (Am. Compl. ¶ 80, D.E. 23), Murphy is an officer of Aegis and Debt Jurisprudence (*id.* ¶ 82), and Kramer is the registered agent and an officer of both Aegis and Debt Jurisprudence (*id.* ¶ 81). However, there are no allegations that Aegis, Murphy, or Kramer had complete domination such that either corporate entity had "no separate mind, will or existence of its own." *66, Inc.*, 998 S.W.2d at 40 (internal quotation marks omitted) (quoting *Collet*, 708 S.W.2d at 284). The court should therefore dismiss Plaintiffs' piercing the corporate veil claim as to Aegis and Debt Jurisprudence.

### L.     Civil Conspiracy

Plaintiffs also assert a civil conspiracy claim in an effort to hold the Defendants jointly

and severally liable. In North Carolina, "[t]here is no independent cause of action for civil conspiracy." *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). However, if the plaintiff can establish the existence of a civil conspiracy, all of the conspirators will be jointly and severally liable for the act of any other conspirator undertaken in furtherance of the conspiracy. *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, No. 5:14-CV-519-F, 2015 WL 4723609, at *7 (E.D.N.C. Aug. 10, 2015) (quoting *Jackson v. Blue Dolphin Commc'ns of N. Carolina, L.L.C.*, 226 F. Supp. 2d 785, 791 (W.D.N.C.2002)).

In order to demonstrate the existence of a civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quoting *Privette v. University of North Carolina*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989)). A claim for civil conspiracy must fail when the plaintiff's underlying claim fails. *New Bar P'ship v. Martin*, 21 N.C. App. 302, 310, 729 S.E.2d 675, 682 (2012).

First, the court must determine whether two or more individuals agreed to commit the wrongful acts alleged in the Amended Complaint. Although the alleged conspiracy involves numerous individuals or entities, Manger is alleged to be an owner and manager of CCDN, LLC, a fellow conspirator, and Murphy and Kramer are alleged to be officers of Aegis and Debt Jurisprudence, also fellow conspirators. As a general rule, under the intra-corporate immunity doctrine, "[a] corporation's officers, employees, or agents are mere extensions of the corporation, and an agreement between such personnel (or between such personnel and the corporation they serve) is therefore not a conspiracy." *Iglesias v. Wolford*, 539 F. Supp. 2d 831, 835–36 (E.D.N.C. 2008). However, this doctrine does not apply if "the officer has an independent personal stake in

achieving the corporation's illegal objectives." *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974). This independent personal stake must be something more than a financial stake in the corporation that is involved in the conspiracy. *See Culver v. JBC Legal Grp.*, P.C., No. 5:04-CV-389-FL(1), 2005 WL 5621875, at *7 (E.D.N.C. June 28, 2005).

### 1. Taylor and Southwood Fail to Allege a Civil Conspiracy

Taylor and Southwood fail to allege a civil conspiracy. Taylor has three underlying claims, all against CCDN, LLC: a claim for conversion, a claim for a violation of subsections (a)(3) and (b) of the CROA, and a claim for fraud. Similarly, Southwood has one claim against CCDN, LLC: conversion. They also sufficiently allege that Manger violated the CROA.

Both Taylor and Southwood's claims arise from their interactions with Lindsey and the Purchase Agreement that they both were sent. Am. Compl. ¶¶ 329–59, 366–412; *see supra* Parts V.C, F, H. However, Lindsey was dismissed from this case and there are no allegations to suggest that CCDN, LLC conspired with any of the remaining defendants to commit conversion or fraud, or violate the CROA. Furthermore, the doctrine of intra-corporate immunity bars Taylor and Southwood from asserting that CCDN, LLC and Manger conspired to injure them as they fail to allege that Manger had an interest in the outcome of the conspiracy that went beyond his financial stake in CCDN, LLC. *See Godfredson v. JBC Legal Grp., P.C.*, 387 F. Supp. 2d 543, 550 (E.D.N.C. 2005). Accordingly, Taylor and Southwood fail to allege a civil conspiracy.

### 2. Hunt, Lucas, and the Beasleys Fail to Allege a Civil Conspiracy

Hunt, Lucas, and the Beasleys do not sufficiently allege a claim for civil conspiracy. They all have a sole underlying claim—Hunt and Lucas sufficiently allege that CCDN, LLC violated subsection (b) of the CROA, the Beasleys sufficiently allege that CCDN, LLC violated subsection (a)(3) and (a)(4) of the CROA, and they all sufficiently allege that Manger violated subsection (a)(4) of the CROA. Accordingly, they can only assert a civil conspiracy claim as to

73

those underlying claims. *See New Bar P'ship*, 21 N.C. App. at 310, 729 S.E.2d at 682. However, a corporation cannot conspire with its own officers, employees, and agents, *Iglesias*, 539 F. Supp. 2d at 835–36, and Hunt, Lucas, and the Beasleys fail to allege that Manger had more than an interest in the outcome of the conspiracy that went beyond his financial stake in CCDN, LLC. Furthermore, the Amended Complaint is devoid of facts that support the assertion that the remaining defendants conspired with CCDN, LLC or Manger to violate the CROA. Therefore, the court should deny Hunt's, Lucas's, and the Beasleys' claim for civil conspiracy.

### 3. Harrison Sufficiently Alleges a Civil Conspiracy between CCDN, LLC and Aegis

Harrison sufficiently alleges that CCDN, LLC and Aegis conspired to violate § 1679b(b) of the CROA. Although Harrison does not allege an explicit agreement between Aegis and CCDN, the allegations in the Amended Complaint allow the court to infer an agreement. Harrison asserts that he paid Aegis to join their "Debt Jurisprudence process," that Aegis sent some of that fee to "CCDN," and that he received various materials from "CCDN" after he submitted his payment. *Id.* ¶¶ 300, 303, 309. He also asserts that CCDN, LLC does business as CCDN. *Id.* ¶ 60. This leads to the plausible inference that CCDN, LLC and Aegis agreed to a scheme to violate the CROA's prohibition against prepayment for services.[24] Furthermore, Harrison was clearly harmed by Aegis's and CCDN, LLC's agreement to violate the CROA as Harrison paid for services before they were rendered. The court should therefore find that Aegis and CCDN, LLC conspired to violate the CROA.

---

[24] Although the allegations as to the other defendants—Kramer, Murphy, and Debt Jurisprudence—appear to support that they were participants in this conspiracy, they are protected by the doctrine of intra-corporate immunity. There are no allegations that suggest that Kramer or Murphy had an independent financial stake in achieving Aegis's illegal objective. Similarly, a corporation cannot conspire with a division within it. *State ex rel. Cooper*, 184 N.C. App. 613 at 625, 646 S.E.2d at 799.

Harrison, however, does not sufficiently allege a civil conspiracy as to his underlying claims of unjust enrichment, conversion, and a violation of the UDTPA. His unjust enrichment, conversion, and UDTPA claims against Aegis arise from a statement made on Aegis's website, and his UDTPA claim against CCDN, LLC arises from a statement in the CCDN manual. *See supra* Parts V.B, C, G.2. Although Harrison alleges that Aegis sold the CCDN program (Am. Compl. ¶ 289, D.E. 23), it sold the program through a contract with R.K. Lock & Associates—a dismissed defendant. (*id* at ¶ 291). Furthermore, there are no allegations connecting the remaining defendants with R.K. Lock & Associates. Accordingly, the court determines that Harrison only sufficiently alleges that CCDN, LLC and Aegis conspired to violate 15 U.S.C. § 1679b(b).

### M.    Constructive Trust

Finally, Plaintiffs seek to have the court impose a constructive trust on Defendants. Courts of equity impose a constructive trust "to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty, or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *United Carolina Bank v. Brogan*, 155 N.C. App. 633, 636, 547 S.E.2d 112, 114 (2002) (quoting *Graham v. Martin*, 149 N.C. App. 831, 835, 561 S.E.2d 583, 586 (2002)). The imposition of a constructive trust is a discretionary matter for the court. *Kinlaw v. Harris*, 364 N.C. 528, 532–33, 702 S.E.2d 294, 297 (2010). Although a fiduciary duty is "generally the basis for constructive trust claims, [it] is not strictly required." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs.*, *LLC*, 365 N.C. 520, 530, 723 S.E.2d 744, 752 (2012). In the absence of a fiduciary duty, a plaintiff must prove "some other circumstance making it inequitable" for defendants to possess the property. *Id.* (quoting *Wilson*, 276 N.C. at

211, 171 S.E.2d at 882). Furthermore, when a plaintiff seeks to impose a constructive trust against a party that did not directly receive property from him, he must substantially identify the trust property. *See id.* at 531–32, 723 S.E.2d at 752. After review, the court determines that Harrison is entitled to a constructive trust for his claims of unjust enrichment and conversion against Aegis.

Hunt, Lucas, and the Beasleys all assert that they paid various "middle men" in the alleged CCDN scheme. *See* Am. Compl. ¶¶ 227, 267, 344, 387, D.E. 23. As already explained, those "middle men" have been dismissed from this case or were not named in the Amended Complaint. As such, these Plaintiffs must substantially identify the funds transferred from the dismissed "middle men" to the remaining defendants in order for the court to impose a constructive trust. These Plaintiffs fail to substantially identify the funds as they merely allege that the remaining defendants received proceeds from the unlawful activity. *Id.* ¶¶ 47, 50, 60, 61, 68, 79, 80, 82, 301, 721; Audio Tr. Dec. 18, 2015 at 11:41:38 to 11:42:45. The court should therefore not impose a constructive trust for these Plaintiffs.

The court should also not impose a constructive trust for Taylor and Southwood. Although Taylor sufficiently alleges claims for conversion and fraud against CCDN, LLC and Southwood sufficiently alleges a claim for conversion against CCDN, LLC, courts are "explicitly discouraged [from imposing] constructive trusts where doing so would give one victim priority over other similarly situated victims," *United States v. Baily*, No. 1:11-CR-00010-MR-DLH, 2013 WL 681826, at *5 (W.D.N.C. Feb. 25, 2013). Hunt, Lucas, and the Beasleys also sufficiently allege claims against CCDN, LLC, and, as already discussed, the court should not impose a constructive trust for their claims. Thus, imposing a constructive trust for Taylor and Southwood would give them priority over Hunt, Lucas, and Beasleys. Accordingly, the court

should also not impose a constructive trust for Taylor and Southwood.

The court should, however, impose a constructive trust for Harrison's claims of unjust enrichment and conversion against Aegis. Although Aegis did not owe a fiduciary duty to Harrison, the facts paint a scheme that, at best misrepresented Aegis's services, and, at worst intended to harm consumers. Furthermore, Harrison is the only plaintiff with claims against Aegis. The court should, therefore, impose a constructive trust as to Harrison's damages arising from unjust enrichment or conversion.

## VI.    Determination of Damages

Plaintiffs request compensatory damages, treble damages under RICO, 80 to 1 punitive damages, and reasonable attorney's fees. According to Plaintiffs, they are entitled to damages "totaling not less than $1,044,000,000." Pls. Mot. Default Judg., *Southwood* D.E. 60; Am. Compl. ¶ 768, *Taylor* D.E. 23. The court will evaluate each request in turn. The court will also address Plaintiffs' need to elect their remedy as many of their claims arise from the same factual scenario. *See infra* Part VI.E.

### A.    Compensatory Damages

Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001). When determining damages in a default judgment, "[t]he court must make an independent determination regarding damages, and cannot accept as true factual allegations of damages." *EEOC v. Carter Behavior Health Servs., Inc.*, No. 4:09-CV-00122-F, 2011 WL 5325485, at *4 (E.D.N.C. Oct. 7, 2011). The court may rely on affidavits or documentary evidence in the record. *Id.*

### 1.    Southwood

Southwood seeks to recover $6,600 of compensatory damages (Pls. Mot. Default Judg. at 1, *Southwood* D.E. 60) and she submitted an affidavit to the court asserting that she paid $5,600 to join the CCDN program and $1,000 in legal fees to defend herself against a collection suit that was the result of following the CCDN program. Southwood Aff. ¶¶ 16, 30, *Taylor* D.E. 93-2.

Southwood sufficiently alleges that Robert Lock and Manger violated RICO (18 U.S.C. § 1964(c)). *See supra* Part IV. She also sufficiently alleges that that the Locks; Manger; CCDN, LLC; and R.K. Lock & Associates conspired to violate RICO (18 U.S.C. § 1964(d)). *See supra* Part IV.D. Southwood suffered $5,600 of damages—the amount she paid to join the CCDN program—because she was the victim of wire fraud that was committed in furtherance of a RICO enterprise. Although Southwood asserts that she had to pay $1,000 in legal fees because of the CCDN program, the RICO predicate acts were not the proximate cause of that injury. *See* Order at 27, D.E. 46. For her RICO claim, Southwood is entitled to treble damages. 18 U.S.C. § 1964(c). Accordingly, the court determines that Southwood is entitled to $16,800 of monetary damages for her RICO claim.

Southwood also sufficiently alleges that CCDN, LLC and R.K. Lock & Associates violated the UDTPA (N.C. Gen. Stat. § 75-1.1 *et seq.*) and that CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger conspired to violate to the UDTPA. *See supra* Part IV. Southwood suffered $6,600 of damages due to CCDN, LLC's and R.K. Lock & Associates' violation of UDTPA—$5,600 due to the marketing of the CCDN program and $1,000 due to the program's recommendation to cease paying credit card debt. *See* Order at 13, D.E. 46; Southwood Aff. ¶¶ 16, 28–30, *Taylor* D.E. 93-2. Southwood is also entitled to treble damages for

this claim. N.C. Gen. Stat. § 75-16. Therefore, the court determines that Southwood is entitled to $19,800 of monetary damages.

Southwood also sufficiently alleges that CCDN, LLC; R.K. Lock & Associates; and Manger violated the CROA, and that CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger conspired to violate the CROA. *See supra* Part IV. Under the CROA, actual damages are defined as "[t]he greater of ... the amount of any actual damage sustained by [a plaintiff] as a result of such failure [to comply with the CROA]; or ... any amount paid by the person to the credit repair organization. *Id.* § 1679g(a)(1). Southwood suffered actual damages in the amount of $6,600 due to CCDN, LLC's; R.K. Lock & Associates'; and Manger's violation of the prohibition against prepayment of services and the prohibition against misrepresentations— $5,600 to join the CCDN program and $1,000 of legal fees incurred because the program failed to provide her with an attorney at no additional cost. Southwood also sufficiently alleges that Manger; CCDN, LLC; R.K. Lock & Associates; and the Locks conspired to violate the CROA. *See supra* Part IV.D. Therefore, the undersigned determines that Southwood is entitled to $6,600 of compensatory damages, recoverable jointly and severally from CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger.

Finally, Southwood sufficiently alleges that CCDN, LLC committed conversion and that CCDN, LLC and R.K. Lock & Associates committed fraud. *See supra* Parts IV, V.C. She also sufficiently alleges that the Locks; Manger; CCDN, LLC; and R.K. Lock & Associates conspired to commit fraud. *See supra* Part IV.D. The amount of damages for each claim is the same: Southwood was fraudulently induced to pay $5,600 to join the CCDN program and CCDN, LLC converted that amount. Accordingly, the court determines that Southwood is entitled to $5,600 of compensatory damages, recoverable jointly and severally from the Locks; Manger; CCDN, LLC;

and R.K. Lock & Associates, for her claim for fraud, or $5,600 of compensatory damages, recoverable from CCDN, LLC, for her claim for conversion.

### 2. Taylor

Taylor seeks to recover compensatory damages of $4,500—the amount he paid to join the CCDN program. Pls. Mot. Default Judg. at 1, *Southwood* D.E. 60. He sufficiently alleges that Manger violated RICO (18 U.S.C. § 1964(c)), that CCDN, LLC violated the CROA (15 U.S.C. § 1679b(a)(3), (a)(4), (b)), that Manger violated the CROA, and that CCDN, LLC committed conversion and fraud. *See supra* Parts V.C, D, F.2, F.3, H.

The amount of compensatory damages for Taylor's RICO, conversion, and fraud claims is the same. However, Taylor is entitled to treble damages for his RICO claim. 18 U.S.C. § 1964(c). Taylor submitted an affidavit to the court asserting that he paid $4,500 to join the CCDN program. Taylor Aff. ¶ 3, *Southwood* D.E. 60-1. As already explained, Taylor was fraudulently induced to join the CCDN program and CCDN, LLC converted the amount he paid to join the program. Accordingly, the court determines that Taylor is entitled to $13,500 of monetary damages, recoverable from Manger, for his RICO claim; or $4,500 of compensatory damages recoverable from CCDN, LLC, for either his claim for conversion or his claim for fraud.

Taylor is also entitled to $4,500 of actual damages for his CROA claim. Actual damages are defined as "[t]he greater of … the amount of any actual damage sustained by [a plaintiff] as a result of such failure [to comply with the CROA]; or … any amount paid by the person to the credit repair organization. *Id.* § 1679g(a)(1). Taylor suffered actual damages in the amount of $4,500 due to CCDN, LLC's and Manger's violation of the prohibition against prepayment of services and the prohibition against misrepresentations. Therefore, if Taylor chooses to recover

under his CROA claim, he will be entitled to $4,500 of compensatory damages, recoverable either from CCDN, LLC or Manger.

### 3. Hunt

Hunt seeks to recover $3,100 of compensatory damages: the $2,500 she paid to join the CCDN program and the $600 of debt defense attorney fees she incurred. Pls. Mot. Def. Judg. at 1–2, *Southwood* D.E. 60. In support of her damages request, Hunt submitted documentary evidence to the court showing damages of $2,500. Hunt Doc. Evid. at 6, *Taylor* D.E. 96-3. She did not submit an affidavit or documentary evidence supporting her claim for debt defense attorney fees.

Hunt sufficiently alleges that Manger violated RICO (18 U.S.C. § 1964(c)) and that CCDN, LLC and Manger violated the CROA. *See supra* Part V.D, F.2. Under the CROA, actual damages are defined as "[t]he greater of … the amount of any actual damage sustained by [a plaintiff] as a result of such failure [to comply with the CROA]; or … any amount paid by the person to the credit repair organization. *Id.* § 1679g(a)(1). Hunt suffered damages in the amount of $2,500—the amount she paid to join the CCDN program—due to CCDN, LLC's violation of the prohibition against prepayment of services. Additionally, Hunt sufficiently alleges the existence of a RICO enterprise and that she was the victim of wire fraud that furthered the RICO enterprise (*see supra* Part V.D) and is therefore entitled to treble damages, 18 U.S.C. § 1964(c). Accordingly, the court determines that Hunt is entitled to $7,500 of monetary damages for her RICO claim, recoverable from Manger, or $2,500 of compensatory damages for her CROA claim, recoverable from CCDN, LLC or Manger.

### 4. Lucas

Lucas sufficiently alleges that CCDN, LLC and Manger violated the CROA. *See supra*

Part V.F.2. She seeks to recover $8,000 in monetary damages and 80:1 punitive damages. Pls. Mot. Def. Judg. at 3–4, *Southwood* D.E. 60. In support of her request for damages, Lucas submitted documentary evidence of a check. Lucas Doc. Ev*id.* at 5, *Taylor* D.E. 96-4. However, that check is marked "Vo*id.*" *Id.* Despite the court's order (*Southwood* D.E. 64), Lucas failed to submit to the court an affidavit averring to her damages or additional documentary evidence of her damages and failed to testify at the hearing held on December 18, 2015. Because "[t]he court must make an independent determination regarding damages, and cannot accept as true factual allegations of damages," *EEOC v. Carter Behavior Health Servs., Inc.*, No. 4:09-CV-00122-F, 2011 WL 5325485, at *4 (E.D.N.C. Oct. 7, 2011), the undersigned cannot recommend that the district court grant Lucas compensatory damages.

### 5. Harrison

Harrison seeks to recover the $4,200 he paid directly to Aegis for the CCDN program and $30,301.02 in measurable damages from following the CCDN program. Pls. Mot. Default Judg. at 2, *Southwood* D.E. 60. In support of his damages request, Harrison submitted an affidavit asserting that he paid Aegis $4,200 and that he was induced to not pay $30,301.02 of his debt. Harrison Aff. ¶¶ 53–54, *Taylor* D.E. 96-2.

Harrison sufficiently alleges that Manger violated RICO (18 U.S.C. § 1964(c)) because he knew or should have known that Harrison received false and misleading legal advice via email and Harrison relied on that advice. *See supra* Part V.D. Harrison did not submit an affidavit stating the amount of damages he suffered from following that legal advice: he only asserts that he paid $4,200 to Aegis to join the CCDN program and that he was induced to not pay $30,301.02 of his debt. Harrison Aff. ¶¶ 53–54, *Taylor* D.E. 96-2. However, Harrison's debt was pre-existing (Harrison Aff. ¶¶ 36, 42, 50–52, *Taylor* D.E. 96-2) and there is no evidence that

it grew as a result of the legal advice. Therefore, the court cannot grant Harrison damages for this claim. *See EEOC v. Carter Behavior Health Servs., Inc.*, No. 4:09-CV-00122-F, 2011 WL 5325485, at *4 (E.D.N.C. Oct. 7, 2011) ("The court must make an independent determination regarding damages, and cannot accept as true factual allegations of damages.").

Harrison also sufficiently alleges that CCDN, LLC and Aegis both violated the UDTPA (N.C. Gen. Stat. § 75-1.1 *et seq.*). *See supra* Part V.G. Harrison paid $4,200 to Aegis to join the CCDN program due to the deceptive statements contained on the Aegis website. *See supra* Part V.G; Harrison Aff. ¶ 54, *Taylor* D.E. 96-2. Harrison was also told by CCDN, LLC to not pay $30,301.02 of debt—a separate UDTPA violation. *See supra* Part V.G; Harrison Aff. ¶ 53, *Taylor* D.E. 96-2. However, Harrison already owed this amount of debt (Harrison Aff. ¶¶ 36, 42, 50–52, *Taylor* D.E. 96-2) and does not assert in his affidavit that CCDN, LLC's instruction caused him to incur additional interest and fees. The court, therefore, cannot grant Harrison damages for CCDN's violation of the UDTPA. Accordingly, because the UDTPA allows for treble damages, N.C. Gen. Stat. § 75-16, Harrison is entitled to $12,600 of monetary damages for his UDTPA claim against Aegis.[25]

Harrison also sufficiently alleges that Aegis; CCDN, LLC; and Manger violated the CROA, and that Aegis and CCDN, LLC conspired to violate the CROA. *See supra* Parts V.F.2, F.3, K. Under the CROA, actual damages are defined as "[t]he greater of … the amount of any

---

[25] The undersigned recommends that Harrison receive punitive damages for his associated state law claims (*see infra* Part VI.B) and reasonable attorney's fees for his UDTPA claim (*see infra* Part VI.C). Therefore, instead of receiving treble damages, Harrison may instead choose to receive compensatory damages and reasonable attorney's fees under the UDTPA plus punitive damages for associated state law claims. *See United Labs, Inc. v. Kuykendall*, 335 N.C. 183, 189–95 , 437 S.E.2d 374, 378–81 (1993) ("There is … no double redress for a single wrong and no inconsistency when a plaintiff recovers untrebled compensatory damages under Chapter 75 and punitive damages under a tortious interference claim.").

actual damage sustained by [a plaintiff] as a result of such failure [to comply with the CROA]; or … any amount paid by the person to the credit repair organization. *Id.* § 1679g(a)(1). Harrison suffered actual damages of $4,200—the amount that he paid to join the CCDN program. Therefore, Harrison is entitled to recover $4,200 of compensatory damages for his CROA claim, recoverable jointly and severally from Aegis and CCDN, LLC, or $4,200 of compensatory damages recoverable from Manger.

Finally, Harrison sufficiently alleges that Aegis was unjustly enriched and committed conversion. *See supra* Parts V.B, C. The amount of damages for each claim is the same: Aegis converted the $4,200 that Harrison paid to join the CCDN program (*see supra* Part V.C) and was also unjustly enriched by that amount (see *supra* Part V.B). Accordingly, if Harrison chooses to recover under either his claim for unjust enrichment or his claim for conversion, he will be entitled to $4,200 of compensatory damages.

### 6. The Beasleys

The Beasleys seek to recover compensatory damages of $5,000. Pls. Mot. Default. Judg. at 2, *Southwood* D.E. 60. In support of their damages request, the Beasleys submitted an affidavit stating that they "paid over $5,000" to join the Credit Collections Defense Network and that following the program caused their debt to grow "to over $100,000." Beasleys' Aff. at ¶ 5, *Southwood* D.E 60-1.

The Beasleys sufficiently allege that CCDN, LLC and Manger violated 15 U.S.C. § 1679b(a)(3) and (a)(4) (CROA). *See supra* Part V.F.3. Under the CROA, actual damages are defined as "[t]he greater of … the amount of any actual damage sustained by [a plaintiff] as a result of such failure [to comply with the CROA]; or … any amount paid by the person to the credit repair organization. *Id.* § 1679g(a)(1). The misrepresentation contained on the CCDN,

LLC marketing website led to the Beasleys' interest in the program (Am. Compl. §§ 454–58, *Taylor* D.E. 23) and they ultimately enrolled in the program (*id.* ¶ 468). Accordingly, the undersigned recommends that the district court grant the Beasleys $5,000 of compensatory damages for her CROA claim, recoverable from CCDN, LLC or Manger. [26]

### B.     Punitive Damages

Punitive damages are "intended to punish the defendant and deter future wrongdoing." *Id.* Punitive damages are available for successful CROA claims, 15 U.S.C. § 1679g(b), and state law claims, N.C. Gen. Stat. § 1D-15. Punitive damages are also available for UDTPA claims if the plaintiff chooses not to recover trebled damages. *United Labs, Inc. v. Kuykendall*, 335 N.C. 183, 189–95 , 437 S.E.2d 374, 378–81 (1993) ("There is … no double redress for a single wrong and no inconsistency when a plaintiff recovers untrebled compensatory damages under Chapter 75 and punitive damages under a tortious interference claim."). However, punitive damages are not available for RICO claims, *See In re XE Servs. Alien Tort Litig*., 665 F. Supp. 2d 569, 599 (E.D. Va. 2009) (finding "that the only relief … for alleged RICO violations is the statutory remedy of treble damages" since "it [is] well-settled that the statutory civil remedy for RICO violations— three times the value of damage to property—is exclusive.") (citing *SouthStar Funding, LLC v. Sprouse*, No. 3:05-cv-253, 2007 WL 812174, at *4–5 (W.D.N.C. Mar. 13, 2007) ("[S]tatutory damages under RICO already contain a punitive component in the form of the trebling provision.")); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 350 (D. Md. 1998) ("The prevailing view is that punitive damages are not available because the treble damages provisions

---

[26] The undersigned recommends that the district court not grant over $5,000 because the Beasleys do not give a specific amount over $5,000 in their affidavit. Additionally, the growth in the Beasleys' debt was not the result of this specific misrepresentation. Even if it was the result of a misrepresentation, the Beasleys do not state the amount of debt they had before joining the CCDN program.

of the RICO statute are punitive in nature.").

When reviewing requests for punitive damages, courts consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996). Courts determine the degree of reprehensibility by considering whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). As for the second factor—the disparity between the potential harm suffered and the punitive damage award—the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* at 424–25. However, the Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. Finally, the third factor is case-dependent and requires an analysis of comparable cases. *Id.* at 428.

North Carolina allows courts to award punitive damages only when the claimant proves that the defendant is liable for compensatory damages and proves by clear and convincing evidence that an aggravating factor—fraud, malice, or willful or wanton conduct—was present. N.C. Gen. Stat. § 1D-15(a), (b). Punitive damages may not be "awarded against a person solely on the basis of vicarious liability for the acts or omissions of another." *Id.* § 1D-15(c). Instead,

they may only be awarded against a person "if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor …." *Id.* When determining whether to impose punitive damages, the court may only consider evidence related to: (1) the reprehensibility of the defendant's motives and conduct; (2) the likelihood, at the relevant time, of serious harm; (3) the degree of the defendant's awareness of the probable consequences of its conduct; (4) the duration of the defendant's conduct; (5) the actual damages suffered by the claimant; (6) any concealment by the defendant of the facts or consequences of its conduct; (7) the existence and frequency of any similar past conduct by the defendant; (8) whether the defendant profited from the conduct; and (9) the defendant's ability to pay punitive damages, as evidenced by its revenues or net worth. *Id.* § 1D-35(2). If punitive damages are awarded, they cannot exceed three times the compensatory damages award, or $250,000, whichever is greater. *Id.* § 1D-25.

The CROA also allows the court to impose punitive damages. When determining whether to award punitive damages, the court must consider, "among other relevant factors … (1) the frequency and persistence of noncompliance by the credit repair organization; (2) the nature of the noncompliance; [and] (3) the extent to which such noncompliance was intentional …." 15 U.S.C. § 1679g(b); *see also Arriola v. Pardo*, No. 1:14cv0745 (JFA), 2015 WL 3404725, at *6 (E.D. Va. May 26, 2015) (imposing 2 to 1 punitive damages when the CROA violations—prepayment for services, misrepresentations made about the status of services, and failure to provide written disclosure statement stating plaintiffs' rights—"were willful and done with the clear intent to deceive the plaintiffs and obtain money from them under false pretenses"); *Rob Evans & Assocs,, LLC v. United States*, No. 12-cv-30130-MAP, 2013 WL 8351202, at *2–3 (D.

Mass. Nov. 20, 2013) (explaining that in previous order, the court imposed punitive damages because the noncompliance with the CROA "(1) was frequent and persistent; (2) involved false pretenses, the use of false representations and amounted to actual fraud; (3) was intentional and/or reckless; and (4) because it affected 260,267 class members"); *Asmar v. Benchmark Literacy Grp., Inc.*, No. 04-70711, 2007 WL 925623, at *1 (E.D. Mich. Mar. 28, 2007) (imposing three to one punitive damages when discovery revealed that Defendants' pre-charged "hundreds of other consumers, unlawfully collecting fees that totaled well into six figures").

All Plaintiffs successfully allege that CCDN, LLC violated the CROA, and Southwood, Taylor, and Harrison successfully allege that CCDN, LLC, Manger, the Locks, or Aegis violated North Carolina law. The allegations contained in the *Southwood* Complaint (*Southwood* D.E. 1-4)[27] and the *Taylor* Amended Complaint (*Taylor* D.E. 23) show that CCDN, LLC, Manger, the Locks, and Aegis willfully participated in a scheme to promise debt relief to financially vulnerable consumers—a promise that, in most cases, could not be fulfilled. This scheme continued for some time, affecting numerous other financially vulnerable consumers. *See* Am. Compl. ¶¶ 97–109, 141–62, 173, 215, 229, 270, 303, *Taylor* D.E. 23; Compl. ¶¶ 5, 46–49, 91, 120, *Southwood* D.E. 1-4; *supra* Parts IV, V.D, V.K. Furthermore, the allegations show that CCDN, LLC's noncompliance with the CROA—requiring pre-payment for services and making misrepresentations—was its regular way of doing business and that CCDN, LLC aggressively marketed its debt relief scheme. Am. Compl. ¶¶ 97–109, 141–62, 173, 215, 229, 270, 303, D.E. 23; Complaint ¶¶ 5, 46–49, 91, 120, *Southwood* D.E. 1-4. CCDN, LLC, Manger, the Locks, and Aegis profited from their conduct. Am. Compl. ¶¶ 68, 173, 229, 270, 303, D.E. 23; Complaint ¶¶

_____

[27] The allegations in the *Southwood* Complaint only support Southwood's request for punitive damages associated with her claim of fraud.

88

18, 21, 23, 120, *Southwood* D.E. 1-4. Accordingly, the court should grant Plaintiffs' request to impose punitive damages for CCDN, LLC, Manger, the Locks, and Aegis's violations of North Carolina State law and for CCDN, LLC's violation of the CROA. The court should not, however, grant punitive damages for Aegis's violations of the CROA because Harrison fails to allege that the noncompliance was intentional.

Although punitive damages are warranted, the court should not grant Plaintiffs' request for 80 to 1 punitive damages. In support of this punitive damages ratio, Plaintiffs cite to *Saunders v. BB&T*, 526 F.3d 142 (4th Cir. 2008), a Fourth Circuit case that upheld 80 to 1 punitive damages. However, that case can be distinguished from the one at hand because the *Saunders* plaintiff was awarded $1,000 of compensatory damages, *id.* at 153–54, whereas Plaintiffs suffered damages at least double that amount, and for some Plaintiffs, four or five times that amount.[28] Instead, the court should impose a punitive damages ratio of three to one. Defendants' actions are truly reprehensible, but a three to one ratio of punitive damages is more in line with punitive damage awards in similar cases. *See Asmar*, 2007 WL 925623 at *1 (imposing three to one punitive damages); *see also Arriola et al. v. Pardo et al.*, No. 1:14cv0745 (JFA), 2015 WL 3404725 (E.D. Va. May 26, 2015) (imposing one to one punitive damages); *Price v. Harps, et al.*, No. 2:08 CV 00517, 2009 Jury Verdicts LEXIS 424371 (E.D. Va. July 21, 2009) (imposing approximately 1 to 1.05 punitive damages); *Conley v. Aggeler*, No. 105cv406,

---

[28] As previously discussed, Southwood submitted an affidavit stating that she paid $5,600 to join the CCDN program and incurred $1,000 of legal fees (Southwood Aff. ¶¶ 16, 30, *Taylor* D.E. 93-2), Taylor submitted an affidavit stating that he paid $4,500 to join the CCDN program (Taylor Aff. ¶ 3, *Southwood* D.E. 60-1), Hunt submitted documentary evidence showing damages of $2,500 (Hunt Doc. Evid. At 6, *Taylor* D.E. 96-3), Harrison submitted an affidavit stating that he paid $4,200 to join the CCDN program (Harrison Aff. ¶ 54, *Taylor* D.E. 96-2), and the Beasleys submitted an affidavit stating they "paid over $5,000" to join the Credit Collections Defense Network (Beasleys' Aff. at ¶ 5, *Southwood* D.E. 60-1).

2006 Jury Verdicts LEXIS 40748 (W.D. Mich. Oct. 24, 2006) (imposing approximately 1 to 1.2 punitive damages); *Direct Fin. Corp. v. Sisco et al.*, No. CV2007-00448, 2012 WL 1606422 (Mass. Super. Oct. 25, 2011) (imposing two to one punitive damages against one defendant and three to one punitive damages against another defendant).

Southwood, Taylor, Hunt, Harrison, and the Beasleys are all entitled to punitive damages. Southwood is entitled to punitive damages for CCDN, LLC's; R.K. Lock & Associates'; and Manger's violation of the CROA. Taylor, Hunt, Harrison, and the Beasleys are entitled to punitive damages for CCDN, LLC's and Manger's violation of the CROA. Taylor is also entitled to punitive damages for his conversion and fraud claims against CCDN, LLC. Similarly, Harrison is also entitled to punitive damages for his unjust enrichment and conversion claims against Aegis. Finally, Southwood is also entitled to punitive damages for her conversion claim against CCDN, LLC, and her fraud claim against CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger.

Lucas, however, is not entitled to compensatory damages for CCDN, LLC's and Manger's violation of the CROA because she failed to submit an affidavit or documentary evidence, or testify as to her damages. Although a plaintiff may recover only punitive damages under the CROA, *see Jones v. Dancel*, 792 F.3d 395, 399, 403 (4th Cir. 2015) (finding that an arbitrator "did not manifestly disregard the law" by imposing only punitive damages); *Parker v. 1-800 Bar None, a Fin. Corp., Inc.*, No. 01 C 4488, 2002 WL 215530, at *8 (N.D. Ill. Feb. 12, 2002) (holding that punitive damages "are not merely ancillary to actual damages, but are instead an independent basis for relief"), Lucas requests the court to grant punitive damages in the amount of a ratio. Because the court cannot find punitive damages using a ratio when there are no compensatory damages, the court should deny Lucas's request for punitive damages.

### C. Attorney's Fees and Costs of Litigation

Attorney's fees or the costs of litigation are available under RICO, 18 U.S.C. § 1964(c), the UDTPA, N.C. Gen. Stat. § 75-16.1, and the CROA, 15 U.S.C. § 1679g(a)(3). For successful RICO claims, plaintiffs are entitled to the cost of the suit, including reasonable attorney's fees. 18 U.S.C. § 1964(c). Similarly, plaintiffs who are successful under the CROA are entitled to the cost of the action, including reasonable attorney's fees. 15 U.S.C. § 1679g(a)(3). Finally, plaintiffs are entitled to attorney's fees under the UDTPA if the presiding judge finds either:

> (1) The party charged with the violation has willfully engaged in the act or practice, and there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of [the] suit; or (2) The party instituting the action knew, or should have known, the action was frivolous and malicious.

*Id.* § 75-16.1; *see also Barbee v. Atlantic Marine Sales & Servs. Inc.*, 115 N.C. App. 641, 648, 446 S.E.2d 117, 121–22, *review denied*, 337 N.C. 689, 448 S.E.2d 516 (1994) ("The award or denial of attorney's fees under section 75-16.1 is within the sole discretion of the trial judge."). In order to recover attorney's fees or the cost of litigation, counsel will have to submit a detailed fee statement to the court.

Southwood, Taylor, Hunt, Harrison, and the Beasleys are entitled to reasonable attorney's fees. Southwood is entitled to the cost of litigation, including reasonable attorney's fees, for her RICO and CROA claims. She is not, however, entitled to reasonable attorney's fees for her UDTPA claim as the *Southwood* Complaint—which asserts the UDTPA claim—does not allege that CCDN, LLC or R.K. Lock & Associates refused to settle the case.[29] Similarly, Taylor and

---

[29] Southwood does allege in *Taylor* that Defendants refused to refund her money. Am. Compl ¶¶ 754, 755, *Taylor* D.E. 23. This allegation does not satisfy this requirement because Defendants refuse to settle the case on October 14, 2009 and November 9, 2009 (*id.*), after *Southwood* was filed.

Hunt are entitled to the costs of litigation, including reasonable attorney's fees, for their RICO and CROA claims. Harrison and the Beasleys are entitled to the costs of litigation, including reasonable attorney's fees, for their CROA claim. Harrison is also entitled to reasonable attorney's fees for his UDTPA claims because he alleges that he demanded his money back twice and that Defendants absolutely refused. Am. Compl. ¶¶ 754–55, *Taylor* D.E. 23.

Lucas, however, is not entitled to the costs of litigation for her CROA claim. In order for a plaintiff to be awarded attorneys' fees under 15 U.S.C. § 1679g(a)(3), she must successfully prove (1) a failure to follow the CROA and (2) either actual damages or punitive damages. *Id.* ("In the case of any successful action to enforce any liability under paragraph (1) [actual damages] or (2) [punitive damages], [the defendant shall be liable for] the costs of the action, together with reasonable attorneys' fees."). Lucas failed to prove that she suffered actual damages from CCDN, LLC's violation of the CROA and failed to convince the court to impose punitive damages. Therefore, the court should not grant Lucas's request for attorney's fees.

### D. Election of Remedies

Many of Plaintiffs' claims arise from the same factual scenario. Accordingly, the court should allow each plaintiff to elect his or her remedies. *See Homeland Training Ctr., LLC v. Summit Point Auto Research Ctr.*, 594 F.3d 285, 292–92 (4th Cir. 2010). Only Southwood, Taylor, Hunt, and Harrison have multiple claims arising from the same facts.

## VII. Conclusion

For the foregoing reasons, the undersigned recommends that the district court grant in part and deny in part Plaintiffs' Motion for Default Judgment (D.E. 60) and finds the following:

1.  Southwood is entitled to a default judgment on her RICO claim against Robert

Lock and Manger, and should be awarded $16,800 of monetary damages,[30] plus costs of litigation, including reasonable attorney's fees, recoverable jointly and severally from CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger.

2.      Southwood is entitled to a default judgment on her CROA claim against Manger; CCDN, LLC; and R.K. Lock & Associates, and should be awarded $6,600 of compensatory damages, $19,800 of punitive damages, and the costs of litigation, including reasonable attorney's fees, recoverable jointly and severally from CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger.

3.      Southwood is entitled to a default judgment on her UDTPA claim against CCDN, LLC and R.K. Lock & Associates, and should be awarded $19,800 of monetary damages,[31] recoverable jointly and severally from CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger.

4.      Southwood is entitled to a default judgment on her claim for fraud against CCDN, LLC and R.K. Lock & Associates, and should be awarded $5,600 of compensatory damages and $16,800 of punitive damages, recoverable jointly and severally from CCDN, LLC; R.K. Lock & Associates; the Locks; and Manger.

5.      Southwood is entitled to a default judgment on her claim for conversion against CCDN, LLC, and should be awarded $5,600 of compensatory damages and $16,800 of punitive damages, recoverable from CCDN, LLC.

6.      Southwood should elect from the remedies provided in Paragraphs 1–5.

7.      Taylor is entitled to a default judgment on his RICO claim against Manger, and should be awarded $13,500 of monetary damages,[32] plus costs of litigation, including reasonable attorney's fees, recoverable from Manger.

8.      Taylor is entitled to a default judgment on his CROA claim against CCDN, LLC and Manger, and should be awarded $4,500 of compensatory damages, $13,500 of punitive damages, and the costs of litigation, including reasonable attorney's fees, recoverable from CCDN, LLC or Manger.

9.      Taylor is entitled to a default judgment on his claims for fraud and conversion against CCDN, LLC, and should be awarded $4,500 of compensatory damages and $13,500 of punitive damages, recoverable from CCDN, LLC.

---

[30] This is Southwood's compensatory damages of $5,600 trebled.

[31] This is Southwood's compensatory damages of $6,600 trebled.

[32] This is Taylor's compensatory damages of $4,500 trebled.

10.     Taylor should elect from the remedies provided in Paragraphs 7–9.

11.     Hunt is entitled to a default judgment on her RICO claim against Manger, and should be awarded $7,500.00 of monetary damages,[33] plus the costs of litigation, including reasonable attorney's fees, recoverable from Manger.

12.     Hunt is entitled to a default judgment on her CROA claim against CCDN, LLC and Manger, and should be awarded $2,500 of compensatory damages, $7,500 of punitive damages, and the costs of litigation, including reasonable attorney's fees, recoverable from CCDN, LLC or Manger.

13.     Hunt should elect from the remedies provided in Paragraphs 11–12.

14.     Lucas is entitled to a default judgment on her CROA claim against CCDN, LLC and Manger, but should not be awarded damages or costs of litigation because she failed to submit sufficient documentation in support of her alleged damages.

15.     Harrison is entitled to a default judgment on his RICO claim against Manger, but should not be awarded damages because he failed to submit sufficient documentation in support of his alleged damages resulting from the misleading legal advice.

16.     Harrison is entitled to a default judgment on his CROA claim against Manger, Aegis, and CCDN, LLC, and should be awarded $4,200 of compensatory damages, $12,600 of punitive damages, and the costs of litigation, including reasonable attorney's fees, recoverable jointly and severally from Aegis and CCDN, LLC or from Manger.

17.     Harrison is entitled to a default judgment on his UDTPA claims against Aegis and CCDN, LLC, and should be awarded either (1) $12,600 of monetary damages[34] plus reasonable attorney's fees, recoverable from Aegis or $4,200 of compensatory damages, $12,600 of punitive damages, and reasonable attorney's fees, recoverable from Aegis.

18.     Harrison is entitled to a default judgment on his claims for unjust enrichment and conversion against Aegis, and should be awarded $4,200 of compensatory damages and $12,600 of punitive damages in constructive trust, recoverable from Aegis.

19.     Harrison should elect from the remedies provided in Paragraphs 15–18.

20.     The Beasleys are entitled to a default judgment on their CROA claim against CCDN, LLC and Manger, and should be awarded $5,000 of compensatory damages, $15,000 of punitive damages, and the costs of litigation, including reasonable attorney's fees, recoverable from CCDN, LLC or Manger.

---

[33] This is Hunt's compensatory damages of $2,500 trebled.

[34] This is Harrison's compensatory damages of $4,200 trebled.

**If Plaintiffs do not object to this Memorandum and Recommendation, they shall submit a memorandum to the court outlining each non-objecting plaintiff's election of remedy within 10 days of service of this Memorandum and Recommendation. The memorandum must cite to the applicable recommendation in the Conclusion (Part VII). If the elected remedy includes attorney's fees, counsel must simultaneously submit a detailed fee statement.**

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on Plaintiffs. Plaintiffs shall have until 14 days after service of the Memorandum and Recommendation on Plaintiffs to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If Plaintiffs do not file written objections to the Memorandum and Recommendation by the foregoing deadline, Plaintiffs will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, Plaintiffs' failure to file written objections by the foregoing deadline will bar Plaintiffs from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the**

**Memorandum and Recommendation.** *See Wright v. Collins*, 766 F.2d 841, 846–47 (4th Cir. 1985).

Dated: Hedtwct{ 48. 4238

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE